**GRACE–CAJUN OIL COMPANY NUMBER TWO, Plaintiff–Appellee, Cross–Appellant,**

v.

**DAMSON OIL CORPORATION, Defendant–Appellant, Cross–Appellee.**

No. 89–3295.

United States Court of Appeals, Fifth Circuit.

April 13, 1990.

Robert L. Theriot, George J. Domas, Liskow & Lewis, New Orleans, La., for defendant-appellant, cross-appellee.

Carl D. Rosenblum, Edward B. Poitevent, II, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiff-appellee, cross-appellant.

Before CLARK, Chief Judge, THORNBERRY and JONES, Circuit Judges.

CLARK, Chief Judge:

## I. Introduction

Damson Oil Corporation ("Damson"), the operator of the Richard No. 1 oil well in Acadia Parish, Louisiana, appeals the district court's determination of Damson's obligation toward Grace–Cajun Oil Company No. Two ("Grace–Cajun"), a working interest owner in the well. Grace–Cajun cross-appeals. We affirm the judgment and remand for further proceedings.

## II. Facts

On December 13, 1979 Delta Energy Resources ("Delta") and Grace–Cajun executed a well operating agreement. Delta agreed to become the sole operator of the Richard No. 1 well, in which Grace–Cajun owned a working interest. In June 1980, Delta entered a gas purchasing agreement which obligated Louisiana Intrastate Gas Corporation ("LIG") to purchase all of the natural gas produced by the Richard No. 1 well at the maximum price allowed by § 102 of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. § 3301 et seq. (1982). Grace–Cajun was named in this contract as the owner of an interest in the gas production. The contract appointed Delta the "Seller's Representative" for all the well's working interest owners. In October of that year, Damson Oil Corporation ("Damson") purchased Delta's interest in the Richard No. 1 well and assumed Delta's responsibilities under the well operating agreement and the gas purchasing agreement.

In July 1980, LIG began purchasing natural gas from Delta at the price allowed by § 109 of the NGPA. The prices allowed by the NGPA range from the low § 109 price through the mid-level § 103 price to the maximum § 102 price. The price which a well operator is allowed to charge for natural gas is determined by a well status determination application which must be filed with and approved by a state agency. In Louisiana, that agency is the Department of Natural Resources. If no application is filed, the operator may legally accept only the low 109 price. Once an application is sub-

mitted, the 103 price is usually allowed, and when the application is approved, the operator may accept the higher 102 price. Although the contract between Damson and LIG called for LIG to buy the gas at the 102 price, in July 1980 LIG could legally pay only the 109 price because no well status determination application had been filed for the Richard No. 1 well.

In February, 1981 LIG began paying Damson the 103 price for the Richard No. 1 gas although no well status application had been filed for the well. Damson distributed these payments to the working interest owners. The monthly payments at the 103 price continued until well operations ceased in 1985. In 1987, LIG discovered that no well status application had ever been filed on the Richard No. 1 well. LIG demanded reimbursement of the difference between the 109 price and the 103 payments. These overpayments totalled $258,097.19, $54,-373.39 of which had been paid by Damson to Grace–Cajun.

LIG accepted Damson's offer to repay the amount in monthly installments. To affect its reimbursement, Damson withheld monthly revenues due the working interest owners. These amounts were delivered instead to LIG. The first notice of the overpayment given by Damson to Grace–Cajun occurred on March 23, 1987, almost two years after LIG demanded repayment from Damson.

Grace–Cajun filed suit in the United States District Court for the Eastern District of Louisiana claiming tort and contract damages against Damson. Grace–Cajun claimed that Damson had been grossly negligent in its operation of the well and that Damson had breached the gas purchase agreement by failing to file the well status application. The district court agreed and ordered Damson to forward Grace–Cajun's withheld revenues to Grace–Cajun and to pay Grace–Cajun's portion of the overpayment reimbursement to LIG out of Damson's own funds. The district court refused, however, to award Grace–Cajun the difference between the 103 price which they had received and the 102 price which was called for by the operating

agreement. The trial judge decided that the complexity of the well status determination application and approval procedure made any damages based on the 102 price speculative.

### III. Damson's Appeal

#### A. Gross Negligence and Breach of the Operating Agreement

The operating agreement between Damson and Grace–Cajun stated that Damson would:

> direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

The district court found that Damson had been grossly negligent in its control of well operations on Grace–Cajun's behalf by failing to file the well status determination application. The court found that Damson could have filed the application as early as October, 1980. A January 7, 1981 Damson interoffice memo shows that as of that date Damson knew the following: (1) the well was receiving only the 109 price for its production; (2) the well should have been receiving the 102 price; (3) the responsibility for filing the application was primarily that of Damson; (4) and the failure to file the application was costing approximately $8,000 per month in well revenues.

The court also found that although Damson knew or should have known that LIG was overpaying well revenues as of the first 103 price payment in February 1981, Damson did not notify Grace–Cajun of this situation until March 1987. Additionally, when Damson initiated its repayments to LIG, monthly well revenues were withheld from Grace–Cajun without Grace–Cajun's permission.

Damson now contends that the district court erred in applying industry standards to find an implicit obligation on Damson's part to file the well status application. The operating agreement provides that no liability attaches to Damson unless its operation of the well either breaches an explicit provision of the contract or is grossly negligent. Damson claims that the obligation to file a well status application is not explicit in the agreement and that its actions were not grossly negligent.

Damson's argument fails. The facts of this case make it obvious that Damson did bear the responsibility of filing the well status application. In its gas purchase contract with LIG, Damson agreed, as the "Seller's Representative" of each working interest owner, to sell *all* of the gas produced by the Richard No. 1 well. Although Damson argues that Grace–Cajun was not a party to this contract, Grace–Cajun is named in the contract as one of the interest owners whose gas would be bought by LIG. Grace–Cajun had the right under its operating agreement with Damson to take its share of the well's gas in kind, or to allow Damson to market it. In the gas purchase agreement, Damson, acting for and on behalf of Grace–Cajun, undertook to exercise the right to market the gas. Damson expressly assumed the performance of the gas purchase contract as Grace–Cajun's representative. In choosing to cooperate with the performance of the purchasing agreement, Grace–Cajun acted reasonably in relying on the term of the agreement which expressly anticipated a 102 gas price. Since the gas purchase agreement named Damson "agent and representative under this Contract for all purposes," Grace–Cajun also acted reasonably in relying on Damson to file the well status application.

At the time the gas purchase contract was executed, Louisiana Civ.Code art. 1903 (1870) read: "The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered as incidental to the particular contract, or necessary to carry it into effect." *See now* La.Civ. Code art. 2054 (1984). When Damson entered a purchasing agreement which included the sale of Grace–Cajun's gas, it as-

sumed responsibility for tasks necessary to its performance of that agreement. *See McCrindle & Sons, Ltd. v. Durant*, 611 F.2d 89 (5th Cir.1980) (applying Louisiana law); *National Safe Corp. v. Benedict and Myrick, Inc.*, 371 So.2d 792 (La.1979). Filing the well status application was one such task.

The district court's opinion stated at one point that the court would gauge Damson's actions against those of a reasonably prudent well operator. The court also expressly found Damson was grossly negligent. Damson contends that the district court erred by applying the "reasonable man" standard of ordinary negligence. It is not necessary to resolve whether the district court applied an improper standard to its determination of Damson's liability under the operating agreement. The gas purchase contract clearly defines Damson's duty.

### B. Damson's Counterclaim

Based on its assertion that Grace–Cajun's claims should have been dismissed, Damson asked the district court to order Grace–Cajun to pay Damson the pro rata amount of LIG's overpayment for which Grace–Cajun was responsible plus interest. Because we affirm the district court's decision in favor of Grace–Cajun, we also affirm the denial of Damson's counterclaim.

### IV. Grace–Cajun's Cross–Appeal

#### A. Unfair Trade Practices

■ In its cross-appeal Grace–Cajun contends that the district court erred in denying its claim for attorney's fees and costs under the Louisiana Unfair Trade Practices and Consumer Protection Act, La.Rev.Stat. Ann. 51:1401 *et seq.* (1987). A trade practice is redressable under this act if it "offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Coffey v. Peoples Mortgage & Loan of Shreveport*, 408 So.2d 1153, 1156 (La.Ct.App.1981). Section 1409 of the act, which provides damages, attorney's fees, and costs, "is penal in nature and is subject to reasonably strict construc-

tion." *Id.* The district court decided that Damson's actions, although grossly negligent, did not fit the Louisiana definition of an "unfair trade practice." We agree. *See Gautreau v. Southern Milk Sales, Inc.*, 509 So.2d 495, 497 (La.Ct.App.1987) (Withholding revenues as a method of debt collection did not amount to an unfair trade practice even though it constituted a tortious conversion.)

#### B. The 102 Price Differential

■ Grace–Cajun also contends that the district court erred in denying Grace–Cajun's claim to its share of the well revenues that would have been distributed had Damson qualified the well to receive the 102 gas price. The district court decided that the complexity of the well status determination application process made it impossible to determine whether the well would have qualified for the 102 price. Damages based on that price, the court reasoned, would be speculative.

We vacate that portion of the district court's decision dealing with the 102 damages issue. Damson breached its obligation under the gas purchase agreement by failing to attempt the 102 well qualification. The gas purchase agreement required at least an attempt to obtain qualification. By neglecting to make any effort to secure such qualification, Damson breached its contractual obligation to Grace–Cajun. One who breaches a contract is liable under Louisiana law for damages to the party entitled to performance. *See, e.g., Womack v. Sternberg*, 247 La. 566, 172 So.2d 683 (1965). That such damages or the right to such damages may be difficult to prove does not excuse that responsibility. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). Here, the failure of Damson to attempt the well qualification caused any uncertainty as to whether the well would have qualified for the 102 price. *See Austin v. Parker*, 672 F.2d 508, 522 (5th Cir.

1982) (applying Louisiana law). The district court here decided that Grace–Cajun was not due damages calculated on the 102 price because:

> [a]lthough the Gas Purchase Contract allowed Damson to charge LIG 'the maximum price permitted by NGPA Section 102,' the procedure for qualifying gas for 102 prices is complicated. Accordingly, this Court has determined that it is impossible to accurately determine whether the Richard No. 1 and No. 2 Wells would have qualified for the 102 price.

Complexity does not render a claim for damages untenable. On remand, Grace–Cajun should be given the opportunity to prove by a preponderance of the evidence that the Richard No. 1 well would have qualified for the 102 price if Damson had filed the well status determination application.

Louisiana has adopted the general rule for computation of contract damages, which states: "the measure of damages for breach of an obligation is the sum which will place the plaintiff in as good a position as he would have been if the obligation had been fulfilled." *Womack v. Sternberg*, 247 La. 566, 172 So.2d 683, 687 (1965). *Accord Nippert v. Baton Rouge Railcar Services, Inc.*, 526 So.2d 824, 827 (La.Ct.App.), *writ denied*, 530 So.2d 84 (1988). Damson's own internal memorandum estimated that the Richard No. 1 well lost approximately $8,000 per month while LIG was paying the 109 price instead of the 102 price. At oral argument, counsel for Damson stated that the damages caused by the failure to receive the 102 price would be approximately double the damages calculated as the difference between the 109 and the 103 price (the overpayment made by LIG). Counsel for Grace–Cajun suggested that the additional damages amounted to $168,299.95, including principal and statutory interest. The district court awarded Grace–Cajun the difference between the 109 price and the 103 overpayment. On remand, if Grace–Cajun can establish with reasonable probability that the well could have received the 102 price if Damson had made and pursued a status determination application, Grace–Cajun should be awarded an additional amount corresponding to the provable difference between the amount actually paid Grace–Cajun for the gas (the 103 price) and the 102 price for the period the 102 price would have been effective.

## V. Conclusion

The judgment of the district court is AFFIRMED. The case is REMANDED for further proceedings consistent with this opinion.