United States Court of Appeals,

Fifth Circuit.

Nos. 90–2570, 91–2220.

R.N. STINE d/b/a Patland Oil Company, Patricia W. Stine, Scott N. Stine, Susan M. Stine, Sherryl F. Stine, and Stacy E. Stine, Trustees, Plaintiffs–Appellees, Cross–Appellants,

v.

MARATHON OIL COMPANY, Individually and as Successor in Interest to Husky Oil Company, Defendant–Appellant, Cross–Appellee.

R.N. STINE, etc., et al., Plaintiffs–Appellees,

v.

HUSKY OIL COMPANY, et al., Defendants,

Marathon Oil Company, etc., Defendant–Appellant.

Oct. 30, 1992.

Appeals from the United States District Court for the Southern District of Texas.

Before BRIGHT,[*]* JOLLY, and BARKSDALE, Ccuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal arises from a diversity action concerning an oil patch joint operating agreement to which Texas law applies.

The Stines and Patland Oil Company ("Stine") and Marathon Oil Company (through its predecessor, Husky Oil Company)[1] became co-owners of oil leases in Texas and entered into a Joint Operating Agreement ("JOA"), which governed their relationship. The JOA contained an exculpatory clause and, under certain circumstances, gave Marathon, as Operator, a lien on the proceeds from the sale of Stine's share of oil and gas produced from the leases. The JOA also created duties and rights between the parties concerning drilling and operation of wells, abandonment of dry holes or wells, etc.

Stine alleged that Marathon breached duties owed him under the JOA in connection with

---

[*]Senior Circuit Judge of the Eighth Circuit, sitting by designation.

[1]Husky made the original deal with Stine. Husky later was acquired by Marathon.

testing and completion of wells;  that Marathon tortiously interfered with his gas sale contract with Cibolo Gas, Inc. (the purchaser of Stine's share of gas);  and that Marathon, by failing to drill certain exploratory wells, abandoned a substantial portion of the lease acreage and, therefore, he (Stine) was entitled to an assignment of that acreage.

Summary judgment was entered in favor of Marathon on Stine's claim for an assignment of lease acreage.  After a jury verdict in his favor, judgment for Stine was entered on contract, tortious interference, and punitive damage counts.  The district court awarded attorney's fees to Stine, but did not require a breakdown of fees between the contract and tort claims.  In the court's view, the two claims were so intertwined that a breakdown would be "impossible" and, in any event, was not "required."

Marathon appeals the jury verdict and the award of attorney's fees;  Stine cross-appeals summary judgment on the acreage assignment issue.  For the reasons set out below, we AFFIRM in part, REVERSE in part, and REMAND for retrial of certain issues.

I

In its broadest outlines, the relevant background is as follows:  In March 1982, Stine arranged with InterNorth, Inc. to take over and develop some 60,000 acres (the Whitehead ranch) of InterNorth leasehold in Concho and Menard counties in Texas.  The agreement between Stine and InterNorth is known as a "farmout."  Through this agreement the owner of a lease delegates, i.e., "farms out," the exploration and development of that lease and assigns that portion of its leasehold interest.  With InterNorth's consent, Stine assigned a portion of his interest under the farmout agreement to Marathon in return for Marathon's payment to Stine of $843,750.  Stine and Marathon memorialized their agreement in a "letter agreement" and the Joint Operating Agreement ("JOA").  The JOA is a comprehensive document that sets out in detail the rights and duties of the parties.  The reach of the JOA's exculpatory clause is a central issue in this appeal.

The farmout from InterNorth required Stine to drill several exploratory wells and continue a regular schedule of drilling such wells;  otherwise, the leasehold acreage that was not in actual production would revert to InterNorth or to the lessor.  In the letter agreement between Stine and

Marathon, Stine agreed to drill the first three exploratory wells. The agreement gave Marathon the right to take over as operator of the farmed out acreage after the first three wells were completed.

Stine drilled the wells, the last of which was productive. Marathon then took over as Operator and drilled two additional wells, which it said were dry. Marathon then proposed to plug and abandon the dry wells. Stine objected; he wanted the wells tested for oil in shallow formations. Marathon did not test the wells. According to Marathon, at that point, Stine failed to comply with the JOA's requirements to take over the wells. Marathon, therefore, later plugged and abandoned them, but only pursuant to what it contends was an order from the Texas Railroad Commission. Stine disputes that the Railroad Commission ordered the wells plugged and abandoned. It contends that the "order" was only an inquiry and that, before plugging and abandoning was actually required, Marathon could easily have obtained an extension of time. Stine argues that, because Marathon failed to turn these wells over to him in accordance with the JOA, the wellbore was damaged; consequently, he had to drill replacement wells in order to test the formations penetrated.

Marathon continued acting as Operator of what had become known as the South Branch Field for several years. During this time, both Stine and Marathon drilled other wells, some were successful and some were not. Stine and others laid a pipeline to the field so that gas could be sold, and further developed the leasehold. Stine contends that Marathon failed timely to complete wells in formations that later proved to be productive. Stine also contends that Marathon refused to share information, as required by the JOA.

Finally, Stine contends that Marathon tortiously interfered with his contract for the sale of his gas to Cibolo Gas, Inc., the operator of a gas pipeline that serves the South Branch field. The JOA sets out a procedure applicable to drilling and all other operations, pursuant to which the operator proposes operations and estimates costs. Each nonoperator then may consent to such operations and its share of the costs. When a nonoperator does not consent ("goes nonconsent" or "nonconsents"), he takes a gamble. If the operation is successful, the operator may collect a multiple of the nonoperator's share of the costs from any production gained by the operation as a reward for having assumed the risk. If, on the other hand, the operation does not result in production, the nonoperator

pays nothing. Under the terms of the JOA, Marathon has the right to take the proceeds of a nonoperator's sale of oil and gas to recover the nonoperator's unpaid share, consent or nonconsent, of drilling and operation costs.

Marathon contends that by June 1983, Stine owed over $600,000 for his share of drilling and operating expenses. In his claim for tortious interference, Stine, while admitting that he owed Marathon his share of charges, argues that Marathon wrongfully overcharged him and wrongly collected his proceeds from Cibolo. Furthermore, on appeal, he argues that Marathon's "embargo" on information left him in the dark about how much Marathon claimed he owed it and how long Marathon would continue to take his proceeds from Cibolo.

Then Cibolo exercised its right under its contract and demanded that Stine reduce the price of his gas by nearly one-half. Stine contends that he refused to accept the lower price and allowed his contract with Cibolo to lapse in order to regain control of his gas revenue because he did not know when this situation with Marathon would end. Consequently, Stine argues that he was damaged by loss of sales of his gas to Cibolo.

Although admitting Stine was overcharged, Marathon disputes Stine's claim of damages. Marathon questions whether Stine was damaged and whether its conduct caused Stine's alleged damages. Marathon also contends that because the JOA gave it the right to take the proceeds of the sale of Stine's gas to Cibolo, it can be liable only for breach of contract. Marathon further contends that, because of the exculpatory clause in the JOA, it can be held liable on that basis only if Stine can show that its actions were grossly negligent or willful, a point on which the district court failed to instruct the jury.

II

In 1983, Marathon sued Stine and others for uncollected operating expenses. Stine counterclaimed and after Marathon had collected, the court realigned the parties. The district court then rendered partial summary judgment in Marathon's favor on Stine's claims that Marathon had abandoned its interest in the lease and that Stine had suffered damages. The remainder of Stine's claims were tried to a jury, which rendered a verdict on May 4, 1990.

The jury found that Marathon had breached its contract with Stine by not delivering operation of two wells to Stine before plugging and abandoning them. The jury found that this breach had caused $106,000 in damages to Stine. The jury also found that Marathon had breached its contract with Stine by not furnishing information as required, causing $750,000 in damages. It found a further breach in Marathon's failure to complete wells in the Tannehill and Lower Cook potential oil sands, which caused $1,500,000 in damages to Stine. The jury found that Marathon was not grossly negligent or guilty of willful misconduct in its operation of well 3, but it did find that Marathon's gross negligence or willful misconduct led to water intrusion in wells 3, 4, 6, and 7 causing $50,000 in damages to Stine. The jury also found that, by causing Cibolo to wrongfully withhold payments to Stine, Marathon tortiously interfered with Stine's contract to sell gas to Cibolo causing actual damages to Stine of $750,000. In addition, the jury found that Marathon's interference was committed with actual malice and, accordingly, awarded Stine $5,000,000 in punitive damages.

The court awarded Stine $222,000 and prejudgment interest for nonconsent penalties that Marathon had improperly collected, as well as $112,034 and prejudgment interest for Marathon's unpaid share of the costs of wells 12 through 17. The parties do not appeal these awards.

Judgment in Stine's favor, based on the jury's verdict and court's awards, was entered June 25, 1990. The district court's order denying Marathon's amended motion for new trial was entered August 9, 1990, and the district court awarded Stine attorney's fees in the amount of $1,230,000 on December 28, 1990. *Stine v. Marathon Oil Co.,* 753 F.Supp. 202 (S.D.Tex.1990). Timely notices of appeal as to both orders were filed and this appeal, consolidating the two, followed.

III

In this diversity case, we apply the substantive law of Texas. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). We review the trial court's conclusions of law *de novo. Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). The jury's findings of fact are reviewed on the whole record and are affirmed if supported by substantial evidence; a scintilla of evidence is insufficient to present a question for the jury, and the jury's finding must be supported by something more than "some evidence." *Boeing Co. v.*

*Shipman,* 411 F.2d 365, 370–74 (5th Cir.1969).  In reviewing the jury's findings, we look to "the [jury charge] as a whole in the context of the entire case.  The judge must instruct the jurors fully and correctly on the law applicable to the case." *Crist v. Dickson Welding, Inc.,* 957 F.2d 1281, 1287 (5th Cir.1992).  The district court has broad discretion in this regard, therefore, our review of its charge to the jury and jury interrogatories is deferential. *Bradshaw v. Freightliner Corp.,* 937 F.2d 197, 200 (5th Cir.1991).  We will reverse a judgment only when "the charge as a whole leaves us with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations. (Citation and internal quotation marks omitted.)" *Hall v. State Farm Fire & Casualty Co.,* 937 F.2d 210, 214 (5th Cir.1991).

A

The reach of the exculpatory clause contained in Article V of the JOA is one of the key questions of this appeal.  The clause provides:

Article V.

Operator

A. Designation and Responsibilities of Operator:  _____ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of, this agreement.  It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except as may result from gross negligence or willful misconduct. *The further provisions of Exhibit "D" attached hereto shall apply in this regard.*  [Underlined material typed in.]

Joint Operating Agreement, Art. V.A.  Marathon and Amicus, Texas Mid–Continent Oil & Gas Association (TMOGA), would have this wording interpreted in such a way that the Operator was protected from liability in connection with any act done under color of the JOA, both torts and breaches of contract.  The district court, on the other hand, interpreted the clause to apply only to acts "unique to the operator under the contract."  Stine would have us limit the operation of the clause to physical acts by the operator within the geographic limits of the contract area of the operating agreement.

A trial court's findings of fact will not be overturned on appeal unless clearly erroneous. Fed.R.Civ.P. 52(a).  The interpretation of a contract, however, is a matter of law reviewable *de novo*

on appeal. *City of Austin v. Decker Coal Co.,* 701 F.2d 420, 425 (5th Cir.1983), *cert. denied,* 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). In Texas, exculpatory clauses are not favored and are strictly construed. *K & S Oil Well Service v. Cabot Corp.,* 491 S.W.2d 733, 738, 739 (Tex.Civ.App.—Corpus Christi, 1973, writ ref'd n.r.e.). To have effect, the contract must be clear and unambiguous. *Id.* at 738.

The clause at issue is sufficiently clear and unambiguous. The clause provides that the Operator "shall conduct all such operations in a good and workmanlike manner, but it shall have no liability *as Operator* to *the other parties* ... except such as may result from gross negligence or willful misconduct." JOA V.A. (emphasis ours). The clause uses the word "liability"—"a broad legal term" whose meaning includes "legal responsibility" and "responsibility for torts." *Black's Law Dictionary* 914 (6th ed. 1990). We find this sufficiently states the parties' intent and, thus, is drafted well enough to meet the requirement of Texas law.

We must now decide how far the exculpatory clause reaches. One authority made the following comment on the language found in Article V:

> The more serious question is the effect of the ... language of Art. V [which] state[s] that the operator shall have no liability to the other parties for losses sustained or liabilities incurred, "except such as may result from gross negligence or willful misconduct." Thus the operator is not liable to the nonoperators for injury caused by the operator's ordinary negligence.... Such clauses do not, of course, purport to authorize the operator to act in a negligent manner. They do however, purport to exculpate the operator from liability for negligent injury to the joint property and partially indemnify him against liability for negligent injury to third parties. Under Art. V., the operator would not be liable to the nonoperators if his negligent drilling resulted in the well blowing out.

Ernest E. Smith, *Duties and Obligations Owed By An Operator to Nonoperators, Investors, and Other Interest Owners, 32 Rocky Mtn.Min.L.Inst.* 12–30 (1986) (hereinafter *Duties and Obligations* ). Smith goes on to ask: "Does the language of Art. V. ... also relieve the operator from liability for conduct which is in breach of specific provisions of the operating agreement?" *Id.* He answers, "[t]he history of the language used in the model forms suggests that it does."

Another authority explains the operation of the clause in this manner: "Operator is exonerated from all losses sustained or liabilities incurred, except those losses or liabilities which "may result from gross negligence or willful misconduct.'" Andrew B. Derman, *Joint Operating Agreement: Working*

*Manual, 2 NATURAL RESOURCES LAW SECTION MONOGRAPH SERIES 11 (1986).* Derman cites a Texas case as holding "that the failure to send supplemental AFE's was not gross negligence," *id.* (citing *Argos Resources v. May Petroleum, Inc.,* 693 S.W.2d 663 (Tex.App.—Dallas [5 Dist.] 1985, writ ref'd n.r.e.), clearly implying, in his view, that the operator's acts in accounting for and billing drilling costs under the operating agreement are subject to the protection of the exculpatory clause.

This court has found, on at least two occasions, that an exculpatory clause in an operating agreement may extend to administrative functions performed by the operator. *See Caddo Oil Co. v. O'Brien,* 908 F.2d 13, 17 (5th Cir.1990) (Caddo, as "Operator," was excused from accounting to nonoperator for charges for operations and was not held to a fiduciary standard because operating agreement made operator "liable to the Owners only in cases of the Operator's willful misconduct"); *Grace–Cajun Oil Co. No. Two v. Damson Oil Corp.,* 897 F.2d 1364, 1366 (5th Cir.1990) (Damson's failure to file well status application not protected by wording exculpating "liability as Operator ... except ... from breach of the provisions of this agreement" because agreement appointed Damson as "agent ... for all purposes").

The tenor of the wording of the exculpatory clause is that Marathon is not liable for good faith performance of "duties under this agreement," but is liable for acts "outside the scope of [its] power under the agreement." *See Spiritas v. Robinowitz,* 544 S.W.2d 710, 718, 717–20 (Tex.Civ.App.—Dallas 1976) (broad exculpatory clause did not reach to acts outside those authorized, as limited, by the agreement). *Cf. Hamilton v. Texas Oil & Gas Corp.,* 648 S.W.2d 316, 323–24 (Tex.App.—El Paso 1982) (JOA provided that damages for acts of Operator could not be awarded absent gross negligence or breach of provisions of JOA; moving drillsite without informing non-operating parties, failing to notify nonoperators, and denying move constituted gross negligence and the damage award was affirmed). Thus, in the present case, Marathon is not liable for any action taken in connection with the completion, testing or turnover, or any well drilled under the provisions of the JOA unless Stine can prove that Marathon's actions were grossly negligent or willful. This protection extends to Marathon's various administrative and accounting duties, including the recovery

of costs under the authority of the JOA.

It is clear to us that the protection of the exculpatory clause extends not only to "acts unique to the operator," as the district court expressed it, but also to any acts done under the authority of the JOA "as Operator." This protection clearly extends to breaches of the JOA. It also reaches other acts including acts performed "as Operator" under the authority of the JOA that amount to tortious interference with contracts with third parties. We, therefore, hold that the exculpatory clause protects Marathon from liability for any act taken in its capacity "as Operator" under the JOA (except for gross negligence or willful misconduct).

B

Having determined the reach of the exculpatory clause, we turn to issues that its application will resolve.

(1)

First, we consider Jury Interrogatory 1:

Do you find that Marathon breached the contract with Patland, Marathon's breach caused damage to Patland [Stine], and there is an amount of damage, if any?

The jury found, in response to this question, that Stine was damaged in an amount totalling $2,356,000 as a result of Marathon's 1) "not delivering operation of Wells 8 and 9 to Patland before plugging and abandoning them," 2) "not furnishing ... the information required to be exchanged between the co-owners," and 3) "not completing wells in the potential oil sands ... earlier than was eventually done." As set out above, we have det ermined that the exculpatory clause in the JOA excuses Marathon for "any liability for any act taken in its capacity "as Operator' if authorized by the JOA (except for gross negligence or willful misconduct)." We note that all three grounds on which the jury found liability were for Marathon's acts "as Operator." The district court, narrowly interpreting the exculpatory clause, did not require any finding by the jury of gross negligence or willful misconduct.

This portion of the verdict, therefore, cannot stand. For this reason, the judgment of the district court awarding damages for "1. Breach of Contract A. Failure to turnover operations: $106,000 and prejudgment interest, B. Failure to provide information: $750,000 and prejudgment

interest, and C. Failure to complete wells timely in potential oil sands: $1,500,000" is REVERSED and REMANDED for a new trial with the jury properly instructed in the light of our interpretation of the exculpatory clause in Article V of the JOA.

(2)

Marathon also complains that "Stine repudiated both Marathon's title to critical portions of their jointly owned lease and Marathon's contractual right to serve as operator." It then asks if it can "nonetheless be liable to Stine for failing to complete certain wells earlier than it did?" Our reversal of the district court's judgment against Marathon for "[f]ailure to complete wells timely in potential oil sands" renders this question moot in the context of this appeal. Marathon may raise this issue on retrial.

C

We turn now to address Stine's claim for tortious interference by Marathon with the gas purchase contract between Stine and Cibolo.

The Texas Supreme Court has held that the assertion of rights under, or breach of, one contract may also at the same time be a tortious interference with "a third party's contract if it is done with a purpose and effect of preventing the third party from performing its contract with another." *American National Petroleum Corp. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274, 279 (Tex.1990). In that case, Transcontinental Gas Pipe Line Corp. ("Transco") had gas purchase contracts with American National Petroleum Corp. ("ANPC"). ANPC also had gas balancing agreements with the operators of fields in which it owned interests in gas wells. *Id.* at 275–76. The gas balancing agreements required the operators to maintain a balance in gas sales among the various working interest owners in the fields. *Id.* Transco breached its purchase contracts by refusing to take ANPC's gas. At the same time, Transco notified the operators of the fields that if they tried to maintain balance as required by the balancing agreements and delivered ANPC's gas, Transco would stop gas purchases from the operators. *Id.* at 276–77. The jury found that Transco had breached its contracts with ANPC and had tortiously interfered with the gas balancing agreements between ANPC and the operators and awarded damages. *Id.* at 277–78.

On appeal to the Texas Supreme Court, Transco argued that it had "established that it was privileged to interfere with the gas balancing agreements." *Id.* at 279. The court replied that "Transco's arguments that it was privileged to interfere amount to an assertion that an act that is a breach of a direct contract can never also be a tortious interference with a different contract. That is not the law.... A knowing and intentional breach of one's direct contract may also be an act tortiously interfering with a third party's contract, if it is done with a purpose and effect of preventing the third party from performing its contract with another. [Citations omitted.]" *Id.* Thus, under Texas law, Stine could make out a tort claim against Marathon if he could prove that Marathon intentionally interfered with his contract to sell gas to Cibolo and that Marathon's actions damaged him.

At this point, let us once again review the facts and theory behind Stine's claim for tortious interference with his contract to sell gas to Cibolo. As operator of the field, Marathon conducted all operations for the interest holders in the field. Stine, a nonoperator, had a responsibility to pay his share of the operation costs incurred by Marathon. The JOA gave Marathon the right to collect the proceeds of Stine's gas sales to recover Stine's unpaid share of operating costs. In August 1983, Marathon exercised this right by notifying Cibolo, the purchaser of Stine's gas, to forward to Marathon the funds it owed Stine. Thereafter, Cibolo began paying Stine's gas sale proceeds to Marathon.

In early February 1984, Cibolo exercised its right under its gas purchase contract with Stine and demanded that Stine, if he wished to continue to sell his gas to Cibolo, reduce the price of his gas by one-half. The record shows that on March 7, 1984, Stine terminated its gas sales to Cibolo. Sometime in March 1984, Stine's debt to Marathon was satisfied. Cibolo continued, however, to send the proceeds of Stine's gas sales to Marathon. Indeed, on April 4, Marathon wrote a letter to Cibolo directing it to continue to send to Marathon Stine's proceeds, notwithstanding the fact that it knew or should have known that Stine's debt was satisfied.

Stine's theory is that he ceased his relationship with Cibolo, not because of the lower price Cibolo was willing to pay for Stine's gas, but in order "to regain control of his gas revenue" from

Marathon. As presented to and decided by the jury, Marathon's tortious act or acts of interference with the Stine–Cibolo contract occurred when Marathon notified Cibolo to continue to withhold Stine's revenues, knowing that Stine's debt to Marathon had been paid. The record does not establish a precise date when Marathon knew that Stine's debt had been paid, but viewing the record most favorably to Stine, it was sometime in March. In any event, Marathon's tortious act or acts, the theory argues, caused Cibolo wrongly to withhold Stine's money, which in turn caused Stine to cease his relationship with Cibolo so that his money would no longer be wrongly withheld, which resulted in damages to Stine from the loss of his gas sales to Cibolo.

With this background in mind, we now turn to the instructions the district court gave the jury. Like the earlier discussed instructions, these instructions also were defective. In collecting the funds from Cibolo, Marathon was still acting as operator under the JOA and, hence, was still entitled to the protection provided by the exculpatory clause. Thus, the jury instructions were deficient because they did not inform the jury that Marathon's alleged tort—sending notices to Cibolo—must have resulted from Marathon's gross negligence or willfulness. It is certainly true, however, that the jury found that Marathon intentionally, and without legal excuse, interfered with Stine's gas contract. Furthermore, in answer to question four, which concerned punitive damages, the jury found that Marathon's interference was malicious. Thus, if this omission in the instructions was our only concern, the jury's answer to question number four might have saved the verdict.

Our review of the trial record, however, fails to reveal sufficient evidence that Marathon's alleged tortious conduct was the proximate cause of Stine's decision to terminate his gas sales to Cibolo, which forms the sole basis of his damages.

The fatal flaw in Stine's causation argument arises from jury interrogatory number 3—the sole interrogatory addressing the tort claim—which asked whether:

> Marathon wrongfully interfered with Patland's [Stine's] gas sale to Cibolo *by continuing to send Cibolo notices* that it was entitled to the proceeds of the sale to Cibolo of Patland's [Stine's] gas *when Marathon knew or should have known* that its proper claims against Patland for lease-related costs were paid and causing Cibolo to withhold Patland's money?

The jury answered "Yes." To uphold the verdict, therefore, we must find some evidence to support the jury's finding that Marathon sent one or more notices to Cibolo when Marathon knew or should

have known that it had no right to the proceeds of Stine's gas sales to Cibolo. Furthermore, the evidence must show that any such notice sent by Marathon was causally related to Stine's decision to terminate his agreement with Cibolo; otherwise, no damages would have flowed from the described tortious conduct.

With respect to such notices sent by Marathon, the evidence shows that Marathon sent only three letters to Cibolo requesting the proceeds of Stine's gas sales. The first two letters were sent in August and September of 1983. Stine admits that he owed Marathon at that time. Thus, it is clear that Marathon did not send those letters at a time when it "knew or should have known that its proper claims against Patland [Stine] for lease-related costs were paid." Marathon sent Cibolo only one other letter requesting the proceeds of Stine's gas sales. Marathon sent that letter on April 4, 1984.

Now, we turn to relate these facts to Stine's theory that Marathon's alleged tort caused him to cease gas sales to Cibolo: Cibolo demanded that Stine lower the price of his gas on February 3, which Stine declined to do. On March 7, Stine terminated his gas sales to Cibolo. On April 4, Marathon sent the *only* notice to Cibolo to withhold Stine's revenues when Marathon knew or should have known that Stine's debt had been paid. When the April 4 notification was sent, Stine had already made the decision not to sell gas to Cibolo. Therefore, because of the chronological order of events, no reasonable juror could have concluded that Stine terminated his gas sales to Cibolo because of Marathon's alleged tortious act of sending unwarranted notices to Cibolo to withhold Stine's revenues. Indeed, the evidence suggests that Stine rejected Cibolo's offer because he was unwilling to accept a fifty percent reduction in the price of his gas. When a jury verdict is so completely unsupported by the evidence in the record, we must reverse. *Boeing,* 411 F.2d at 370–74.[2]

We therefore REVERSE this part of the verdict and RENDER judgment in favor of Marathon.

D

---

[2]Because the evidence in the record fails to show there was a causal connection between Marathon's conduct and Stine's decision to terminate his gas sales to Cibolo, we do not have to address Marathon's contention that the jury improperly awarded the same damages twice. Similarly, we do not have to address Marathon's allegation that the evidence in the record does not support the amount of damages that the jury awarded.

Our reversal of the count for tortious interference requires us to reverse the award of punitive damages. Under Texas law, a jury may not award punitive damages unless it has determined that the plaintiff has also sustained actual damages. *1488, Inc. v. Philsec Inv. Corp.,* 939 F.2d 1281, 1291 (5th Cir.1991). Our reversal of the judgment for tortious interference leaves nothing to support the jury's award of punitive damages. The award of punitive damages is, therefore, REVERSED, along with the count for tortious interference.

E

Marathon further complains that the district court erred "in holding that Stine was not required to segregate his attorney's fees and in awarding Stine $280,000 in fees for five expert witnesses." Stine replies that the district court's award of attorney's fees did not mention expert fees, but was an award for attorney's fees within its discretion.

 Texas law requires the attorney's fee be limited to a contract award, it does not permit an award of attorney's fees for tort claims. *See V.T.C.A. Civil Practices & Remedies* §§ 38.001–.006 (lists claims for which attorney's fees are allowed, presumptions and exceptions). Texas law requires that attorney's fees arising from multiple claim litigation be allowed only for those claims for which they are authorized. *E.g., Bullock v. Kehoe,* 678 S.W.2d 558, 560 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Because the district court failed to require segregation of the attorney's fees, and now, also because we have reversed both the contract and tort awards, we must also vacate and remand the award of attorney's fees. Texas law states that "an award of attorney's fees erroneously based upon evidence of unsegregated fees requires a remand." *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 11 (Tex.1991); *Marcotte v. American Motorists Ins. Co.,* 709 F.2d 378, 381 (5th Cir.1983).

The district court abused its discretion by finding that allocation of the fees was not required. *Stine v. Marathon Oil Co.,* 753 F.Supp. 202, 204 (S.D.Tex.1990). However, Stine is correct in stating that the district court made no specific award of expert witness fees. On remand, the district court can address whether expert witness fees were awarded. If they were awarded, such an award would appear to be in violation of 28 U.S.C. § 1821 and Texas law. *Sparks v. Baxter,* 854 F.2d 110,

115 (5th Cir.1988). In any event, the district court's award of attorney's fees, 753 F.Supp. 202, is REVERSED and REMANDED.

IV

On cross-appeal, Stine contends that the district court erroneously awarded summary judgment in Marathon's favor on Stine's claim that Marathon had manifested an intent to surrender its acreage subject to the JOA in early 1984, and was, therefore, obligated under the terms of the JOA to assign that acreage to Stine. The standard of review for a summary judgment is well settled:

> We review the record *de novo* to ascertain whether any genuine issue exists as to any material fact and, upon finding none, to ascertain whether the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Miles v. American Tel. & Tel. Co.,* 703 F.2d 193 (5th Cir.1983). Without weighing the evidence, assessing its probative value, or resolving any factual disputes, *id.,* we merely search the record for resolution-determinative factual disputes. *Kennett–Murray Corp. v. Bone,* 622 F.2d 887 (5th Cir.1980).

*FDIC v. Myers,* 955 F.2d 348, 349, 350 (5th Cir.1992). Once a motion for summary judgment is made and adequately supported, the non-movant cannot rest on pleadings but must bring forth significant probative evidence to prevent summary judgment. *Union Planters Nat'l. Leasing Inc. v. Woods,* 687 F.2d 117 (5th Cir.1982).

Stine's claim is based on article VIII.A of the JOA, which provides that:

The leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any lease or in any portion thereof, and other parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest is such lease or portion thereof.... to the parties not desiring to surrender it.

This provision of the JOA required Marathon to assign its interest in the lease to Stine if it decided to surrender that interest. Stine contends that, because Marathon intended to forfeit part of its interest in the lease, he had a right to that interest.

In order to survive the summary judgment motion, however, Stine had to present some evidence suggesting that Marathon possessed the required intent to surrender the lease or a part thereof. That evidence was as follows: Under the farmout agreement between Stine and InterNorth, Stine had an obligation to drill two exploratory wells a year, or pay a delay rental. If he failed to drill the wells or to make the delay rental, he would forfeit his interest in the acreage not held by

production. When Stine assigned part of his interest in the lease to Marathon, Marathon became a joint farmee with a concurrent obligation to drill the wells; indeed, as operator under the JOA, Marathon had the initial responsibility to drill the wells. The evidence further shows that Marathon, while attempting to sell its interest in the lease to Thrash Oil & Gas Co., informed Thrash and InterNorth that it was not going to drill the two exploratory wells. Stine argues that this evidence demonstrates Marathon's intent to surrender the lease. As it turned out, however, the sale to Thrash fell through, Stine drilled the two wells, and no forfeiture to InterNorth occurred. Stine asserts that, based on these facts, it is possible for a jury to infer that Marathon intended to surrender its interest in the leased property and consequently, under article VIII.A. of the JOA, Stine is entitled to an assignment of the acreage from Marathon.

The district court, however, found that the JOA creates no duty on the part of the Operator to develop the lease. As the district court pointed out, under the JOA, both Stine and Marathon had the right to drill these wells. The district court further stated that the duty created by the farmout from InterNorth existed only between farmor and farmee—it did not extend to and between the farmees (parties to the JOA), Stine and Marathon. The district court concluded that "[t]he terms of the InterNorth farmout were not violated, and Marathon's conduct during the attempted sale to Thrash was not an abandonment. Logic would dictate that a party is not abandoning something it is attempting to sell."

The district court did not err. As Smith points out in his article to which we earlier have referred: the "[p]reservation of title to the leases contained within the Contract Area is not the sole responsibility of the operator. The operating agreement requires each participant to preserve the lease which he contributed by making timely payments of delay rentals and shut-in royalty." *Duties and Obligations* at 12–49. In this case, the obligation to drill the two exploratory wells was simply an alternative to a payment of a delay rental. Stine and Marathon were each under an obligation to drill those wells and preserve the lease. Marathon's decision not to drill the wells during its negotiations with Thrash is not probative evidence that Marathon intended to abandon or to surrender the non-productive part of the lease. Certainly Marathon never expressed any desire to abandon the

lease or to surrender its rights to the acreage. Moreover, the intent to surrender the property is patently inconsistent with the intent to sell it. No reasonable juror could conclude from Marathon's refusal to drill the wells that Marathon intended to surrender part of the lease within the meaning of article VIII.A. of the JOA.

We, therefore, AFFIRM the district court's summary judgment in Marathon's favor on Stine's claim that Marathon abandoned a portion of the lease.

V

Before we sum up our holdings, we take time to address Marathon's complaint that, in its rush to complete the trial of this matter, the district court deprived it of a fair trial. Marathon complains that the district judge allowed Stine's attorneys to lead witnesses. Furthermore, the district judge did not allow deposition testimony to be read to the jury; instead, the judge required both sides to put pertinent excerpts of depositions into juror notebooks that the jury was instructed to read out of court. Finally, at the outset of the case when setting the time allowed for each party to present its case, the judge allowed insufficient time for a trial of this complexity.

Marathon did not object to these rulings at trial. Normally, we will not consider assignments of error presented for the first time on appeal. Particularly in a case like this, we place a high value on the principle that the parties should make the trial judge aware of their objections so that the court has an opportunity to respond appropriately.

This case will, however, have to be, in large part tried again. In the interests of ensuring the proper method of retrial, we will review Marathon's complaints. In doing so, we observe as a preliminary matter that the " "conduct of a fair trial is vested in the sound discretion of the trial judge,' and on review his conduct "will be measured against a standard of fairness and impartiality.' [Citation omitted.]" *In re P & E Boat Rentals, Inc.,* 872 F.2d 642, 653 (5th Cir.1989).

The district court allowed both sides to use leading questions to speed the examination of witnesses. Fed.R.Evid. 611 allows the use of leading questions "to develop the witness' testimony." In addition, the comment to the rule points out that "[a]n almost total unwillingness to reverse for infractions [of the rule concerning leading questions] has been manifested by appellate courts." We

also note that the district judge sustained a number of objections to leading questions by both parties. We find nothing in this portion of the judge's conduct of the trial that evidences such an abuse of discretion or partiality to either of the parties that it amounts to plain error. We urge the trial court, however, to limit the use of leading questions to non-controversial or background areas—leading questions must not be allowed in controverted substantive areas where the jury must weigh the evidence and make credibility determinations. As we all are fully aware, any good trial advocate who is allowed leading questions can both testify for the witness and argue the client's case by the use of leading questions. This practice must not be allowed.

Marathon's complaints about the time allowed for trial are subject to the same weakness in that the district judge's actions do not rise to the level of plain error. The district judge was not unfair or impartial—both sides were placed equally under time constraints.

We view with considerably greater concern, however, the district court's practice in this case of requiring the parties to provide excerpts of depositions to the jury, rather than allowing this testimony to be read in open court. Such a practice requires the jury to spend time outside the courtroom, over and above a full day in the courtroom. The jury's reading of the deposition excerpts was thus totally outside the supervision of the trial judge. Indeed, the procedure followed incurs a real risk that the jurors merely took the excerpts home and brought them back the next day unread and, thus, reached a verdict without having considered all the evidence. Marathon argues that this procedure violates Fed.R.Civ.P. 43(a) ("In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided ... by these rules.") and 77(b) ("All trials upon the merits shall be conducted in open court."). Marathon, however, overlooks the provisions of Fed.R.Civ.P. 32, "Use of Depositions in Court Proceedings," which allows the restricted use of depositions as evidence. There is no explicit requirement in Rule 32 that depositions be read in open court. Nevertheless, we believe that the practice of providing "evidence to go" or "takeout evidence" is generally inappropriate.

We are, however, faced with the fact that both parties agreed to the procedure. Furthermore, the judge did specifically instruct the jury to read the deposition excerpts and jury notebooks provided

them.  There is an "almost invariable assumption of the law that jurors follow their instructions," *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1706, 95 L.Ed.2d 176 (1987), so we are forced to conclude that the jury read the material provided them as they were instructed to do.  In a civil case, the trial court is required only to meet a "standard of fairness and impartiality" in its conduct of the trial.  *P & E Boat Rentals,* 872 F.2d at 653.  We, therefore, conclude that Marathon's complaints concerning the conduct of the trial do not rise to plain error.

VI

We sum up as follows:

1. We hold that the exculpatory wording at issue protects Marathon from liability for any act taken in its capacity "as Operator" if authorized by the JOA (except for gross negligence or willful misconduct), whether the conduct at issue is connected with administrative acts or physical operations.

2. The judgment of the district court awarding damages for "1.  Breach of Contract A.  Failure to turn over operations:  $106,000 and prejudgment interest, B. Failure to provide information: $750,000 and prejudgment interest, and C. Failure to complete wells timely in potential oil sands: $1,500,000" is REVERSED and REMANDED for new trial with the jury properly instructed in the light of our interpretation of the exculpatory clause in Article V of the JOA.

3. The district court's judgment, "3. Tortious Interference:  A. $750,000 principal;  B. $573,346.36 prejudgment interest.  4. Punitive damages:  $5,000,000," is REVERSED and RENDERED, and the district court shall enter a judgment in favor of Marathon on this claim.

4. The district court's award of attorney's fees, 753 F.Supp. 202, is REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

5. The district court's summary judgment in Marathon's favor on Stine's claim that Marathon abandoned a portion of the acreage subject to the JOA is AFFIRMED.

AFFIRMED in part, REVERSED in part, RENDERED in part, and REMANDED in part.