Norman T. TOMPKINS, M.D. and Carolyn Tompkins, Plaintiffs,

v.

Thomas CYR, et al., Defendants.

No. 3-94-CV-0973-BD.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 7, 1998.

See also, 878 F.Supp. 911.

Windle Turley, Law Office of Windle Turley, Dallas, TX, Linda Turley, Law Office of Linda Turley, Dallas, TX, for Plaintiffs.

William Charles Bundren, Law Office of William Charles Bundren, Coppell, Kelly G. Rogers, Dallas, TX, Donovan Campbell, Jr., Rader Campbell Fisher & Pyke, Dallas, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

KAPLAN, United States Magistrate Judge.

Plaintiffs Norman T. Tompkins and Carolyn Tompkins obtained an $8.5 million verdict against eleven abortion protestors after a jury trial. Three motions remain pending before the Court: (1) defendants' renewed motion for judgment as a matter of law; (2) plaintiffs' motion for judgment on the verdict; and (3) plaintiffs' motion for injunctive relief. For the reasons stated herein, defendants' renewed motion for judgment as a matter of law and plaintiffs' motion for judgment on the verdict are granted in part and denied in part. Plaintiffs' motion for injunctive relief is granted, as modified.

## I.

### BACKGROUND

Norman T. Tompkins is a medical doctor who specializes in obstetrics and gynecology.

He practiced medicine at various hospitals in the Dallas area for 26 years and served on the faculty of the University of Texas Southwestern Medical School. As a small part of his practice, Dr. Tompkins performed abortions.

Defendants are individuals and organizations who vehemently oppose abortion. Thomas Cyr is the former president of Dallas Pro–Life Action League ("Dallas PLAN"). Phillip Benham is the former director of the Dallas/Fort Worth branch of Operation Rescue. Louis Farinholt is affiliated with an organization called Missionaries to the Pre–Born. The remaining defendants—Richard Blinn, Oldrich Tomanek, Ann Hollacher, Ellen Pavlich, Laura Tellier, and J.R. Dannemiller—all were involved, either formally or informally, with Dallas PLAN.

The acknowledged mission of these pro-life activists was to convince Dallas area doctors to stop providing abortion services. Toward this end, Dallas PLAN devised "Operation John the Baptist." The main thrust of this campaign was to confront doctors who performed abortions and ask them to "repent" for their "sins." Cyr drew up a statement for the doctors to sign.[1] Any doctor refusing to sign this agreement would be "exposed" wherever he went until he agreed to stop performing abortions. This "exposure" took a variety of forms, discussed more fully below. Dallas PLAN compiled a list of twenty physicians to target in this manner. Dr. Tompkins was one of those doctors.

In October 1992, Cyr and Hollacher approached Dr. Tompkins in his driveway as he prepared to leave for work. Dr. Tompkins asked them to make an appointment to come to his office at Presbyterian Hospital. Soon thereafter, Dr. Tompkins met with Cyr and Hollacher. Cyr told Dr. Tompkins that he was a Christian, that he was morally opposed to abortion, and that he wanted Dr. Tompkins to conform his behavior accordingly.

Cyr asked Dr. Tompkins to sign the agreement and allow Dallas PLAN to take his picture. (*See* Pl. Exhs. 574, 707). Cyr mentioned that he had organized a protest against Clay Alexander, another local physician, until Dr. Alexander finally agreed to stop performing abortions. Daniel Scott, who was present at the meeting, testified that Cyr threatened to "make [Dr. Tompkins'] practice go away" if he did not sign the pledge. Dr. Tompkins refused this ultimatum and the meeting ended.

Dallas PLAN made good on its threat and organized a demonstration at plaintiffs' home. Dr. Tompkins and his wife lived on the corner of Forest Lane, a busy six-lane street, and Forest Lakes, a cul-de-sac. Plaintiffs introduced a videotape of one of the pickets. (Pl.Exh. 721). It showed a group of people standing in the driveway, holding signs and chanting. Mrs. Tompkins testified that the demonstrators often amassed in this small area in front of her garage. The picketers would also "mill around" and march up and down the street. The evidence showed that the protestors held at least eight full neighborhood marches.

The first demonstration drew approximately ninety people. Thereafter, the numbers dwindled, but protestors still gathered at plaintiffs' home every Saturday morning and Sunday afternoon for at least two hours. A small group of activists appeared at the house every morning when Dr. Tompkins and his wife left for work and every evening when they returned. Several witnesses identified Tomanek, Benham, Cyr, Farinholt, Hollacher, and Tellier as some of the more frequent participants in these protests.

The protestors carried signs calling Dr. Tompkins a "murderer," "abortionist," and "tool of Satan." Other signs showed graphic pictures of dismembered fetuses. Dallas PLAN posted fliers around the neighborhood

---

1. This agreement read as follows:

"I, Norman T. Topkins [sic] MD—OB/GYN, swear that I will never participate directly or indirectly in abortion, whether legal or not. Additionally, if found to break this word that I, as chief medical staff on duty, shall have final authority over care, custody and control or premises, now order that any persons who are attempting to physically prevent me from carrying out these abortions, shall be immune from arrest and prosecution.
I will cease all contracting with women's clinics listed in the yellow pages as providers for abortions. I will not enter the premises of any of the same clinics for any reason whatsoever. I warrant that I am entering into this agreement of my own free will and not under any coercion, whatsoever."
(Pl.Exh. 707).

with Dr. Tompkins' picture and the words "Not Wanted" underneath. The picketers would often chant, sing, and pray during their protests. They sometimes called out to passing cars and tried to force literature on plaintiffs' neighbors as they entered or left their homes. In addition, Benham frequently used a bull-horn to preach to the crowd. However, other than a few citations for blocking traffic, the demonstrations were not violent.

The picketing was not confined to plaintiffs' residence. Dallas PLAN also organized demonstrations at Presbyterian Hospital and the Boy Scouts of America headquarters where Mrs. Tompkins worked. Several protests also were staged at Highland Park Methodist Church where plaintiffs worshiped. From October 1992 until a preliminary injunction was issued in July 1993, protestors picketed at plaintiffs' home, work, or church for at least two hours every day. Dallas PLAN established a telephone hotline and left information about the date, time, and location of the demonstrations targeted against plaintiffs.

Operation John the Baptist was not merely a picketing campaign, however. Dallas PLAN also devised a variety of other tactics to increase the pressure on Dr. Tompkins to stop performing abortions. Cyr testified that he often discussed these tactics with Benham, Farinholt, Tomanek, Hollacher, Blinn, and Tellier. Dallas PLAN published plaintiffs' address and telephone number in its newsletter and encouraged readers to contact them at least twice a week. (Pl.Exh. 558). Consequently, plaintiffs were deluged with literally hundreds of postcards and letters exhorting them to "stop the killing." (*See* Pl.Exhs. 575A–J, 576A–B, 587, 592, 595, 610, 613–638, 641–648, 698, 720). Some of the postcards bore a picture of plaintiffs' home, including one showing the Tompkins standing outside their residence. Dallas

PLAN produced and distributed these cards. Several anonymous letters indirectly threatened plaintiffs with physical harm.[2] In addition, Cyr sent a letter to plaintiffs advising them to "[m]inimize your losses." Benham, Tomanek, and Hollacher also sent letters or postcards.

Plaintiffs received numerous phone calls at all hours of the day and night. Several anonymous callers made death threats.[3] Tomanek left Dr. Tompkins a message threatening to "get him." Cyr and Tomanek called so frequently that plaintiffs recognized their voices. Plaintiffs also received phone calls from Hollacher, although she recalled only placing two such calls. About one month after this telephone campaign began, Dallas PLAN's newsletter scolded its readers: "Tompkins' home phone is still in operation. That only means he is not being contacted enough about his killing." (Pl.Exh. 558).

Dallas PLAN also organized a surveillance of plaintiffs' residence.[4] Several defendants parked their cars in a cul-de-sac that runs behind the house and kept a near-constant watch of plaintiffs inside their home. Cyr, Tomanek, and Farinholt all participated in this surveillance. Plaintiffs' neighbor, Linda Pennington, testified that these defendants often had binoculars and a camera with them while they sat in the car. Tomanek sent several postcards to plaintiffs indicating that he had been watching them. (Pl.Exhs. 575A, 575E, 595).

Cyr, Tomanek, Benham, and Farinholt, alone or in various combinations, routinely followed plaintiffs when they left the house. Cyr took pictures of plaintiffs' license plates for that purpose. Dr. Tompkins often knew he had been followed because he would find a Dallas PLAN pamphlet or flier under the windshield of his car. He said that he was followed nearly every time he left the garage.

---

**2.** Plaintiffs received a handwritten letter purportedly sent from "The Sword of Almighty God" in "Sometimesoon, Tx." The letter stated: "Obviously, you dont [sic] know what a real 'terrorist' is. Perhaps, someday soon you will. Think not that I am come to send peace on earth: I came not to send peace, but a sword. Mat 10 vs 34." A pre-printed message on one side read: "The Knights of the Ku Klux Klan are watching you and we don't like what we see." (Pl.Exh. 572).

**3.** One unidentified caller threatened to cut out Mrs. Tompkins' liver, force Dr. Tompkins to eat it, then cut off Dr. Tompkins' head. (Pl.Exh. 584).

**4.** Plaintiffs' house backed onto a lake and had large, undraped windows to allow for a full appreciation of this view.

Mrs. Tompkins was often followed to work. On one occasion, Cyr, Tomanek, and Farinholt followed Dr. Tompkins to a restaurant. They confronted him while he was eating lunch and forced him to leave. Cyr taped this incident and it was shown to the jury. (Pl.Exh. 708). On December 11, 1992, Cyr and Tomanek followed plaintiffs as they were on their way to a party. Plaintiffs tried to elude the defendants and a high speed chase ensued. Cyr and Tomanek were stopped by the police after plaintiffs called for help on their car phone. (*See* Pl.Exh. 577).

Benham and Tomanek trespassed on plaintiffs' property during the pickets and at other times. Witnesses testified that Tomanek would cross plaintiffs' property line "every chance he got" to place posters on their house and gate. Tomanek disturbed plaintiffs' Thanksgiving dinner by rattling their front gate and yelling at them. On another occasion, plaintiffs returned home to find dozens of small white crosses planted in their yard. They noticed Benham sitting on their front porch.

Finally, Mrs. Tompkins had two frightening confrontations with Tomanek. On the evening of November 17, 1992, Tomanek rushed at Mrs. Tompkins as she opened the garage door to take out the garbage. He was yelling at her, "Mrs. Tompkins, Mrs. Tompkins, you've got to stop your husband from killing babies. He's killing babies, and I've got to talk to you." Tomanek got very close to her and continued to yell as she put the garage door down. Mrs. Tompkins was extremely scared and shaken by this incident because she was home alone and it was dark outside. On another occasion, Tomanek ran up to Mrs. Tompkins while she tried to get her mail. He shouted, "Stop the killing now. Aren't you afraid, Mrs. Tompkins, I'm going to shoot you now?" Mrs. Tompkins said that this incident was particularly frightening because it occurred just after the state court heard testimony in an injunction hearing about a doctor in Florida who had been shot to death by an abortion opponent.

These activities continued unabated for ten months and had a profound impact on plaintiffs. Dr. Tompkins and his wife testified that they lost all sense of privacy and security within their own home. They became fearful for their personal safety and hired bodyguards to be with them 24 hours a day. Dr. Tompkins wore a bullet-proof vest when he was out in public and had his car equipped with a bomb detection device. He testified that he feared for his life because he knew what had happened to other doctors and thought he might be next. Plaintiffs told their two grown children not to visit anymore and did not spend the holidays with them. Mrs. Tompkins would not visit her daughter, who lived in Dallas, for fear that the protestors would discover where she lived. Plaintiffs also decided to hold their daughter's wedding out of town and not post an announcement in the paper to avoid attracting attention. Nevertheless, plaintiffs received a letter from Cyr referring to their children. They found this particularly threatening in light of the precautions taken to protect their family. (Pl.Exh. 650).

Dr. Tompkins' medical practice also suffered. His caseload dwindled from 12 to 15 patients a day to only two or three. He delivered just one or two babies a week instead of five or six. As a result, Dr. Tompkins was unable to pay his rent to Presbyterian Hospital. In April 1994, he closed his medical practice and moved to Gainesville, Texas, a rural community located more than an hour from Dallas. Dr. Tompkins explained that closing his practice of 26 years felt like "losing my mother." He was forced to take work as an emergency room physician to meet his financial obligations. This involves longer, more erratic hours and is more difficult than his previous practice. Dr. Tompkins also makes less money because the majority of his patients are on Medicare and Medicaid. Plaintiffs have been forced to maintain two households because they need the extra income Mrs. Tompkins earns from her job to pay their expenses.

Plaintiffs experienced mental anguish and emotional distress as a result of the defendants' actions. Dr. Tompkins, once affable and outgoing, is now moody, withdrawn, anxious, and easily angered. He started to have problems with high blood pressure. Dr. Tompkins fears for his life and has a recurring dream about being shot and having his daughter discover his body. He has trouble eating and sleeping. Mrs. Tompkins also has

problems sleeping. She no longer feels secure in her home and is afraid to be alone. Mrs. Tompkins is frightened when the phone rings. She becomes depressed, overly emotional, and is easily moved to tears.

Plaintiffs eventually took legal action to end this campaign of harassment and intimidation. They sued defendants in state court for intentional infliction of emotional distress, tortious interference, invasion of privacy, civil conspiracy, and related torts. The state court issued a preliminary injunction limiting the frequency, duration, and nature of the picketing at their home and church. Defendants removed the case to federal court after plaintiffs amended their pleadings to allege a RICO claim.

The case was tried to a jury on October 11–17, 1995. A partial verdict was returned on October 25, 1995. The jury found in favor of plaintiffs on their claims for intentional infliction of emotional distress, invasion of privacy, and civil conspiracy.[5] Plaintiffs were awarded a total of $2,248,000 for intentional infliction of emotional distress and $2,800,000 for invasion of privacy. Ten defendants were order to pay a total of $3,450,000 in exemplary damages. The jury found in favor of all defendants on the claims for tortious interference with a residential sales contract. They were unable to reach a unanimous verdict on the claims for tortious interference with existing or prospective patients and civil RICO.

Defendants have now moved for judgment as matter of law and plaintiffs have moved for entry of judgment on the verdict. Plaintiffs also seek a permanent injunction to limit any future protests or demonstrations. The issues have been fully briefed by the parties and these motions are ripe for determination.

## II.

### FIRST AMENDMENT ISSUES

Before considering whether the evidence is sufficient to support the jury's verdict as to each claim for relief, the Court must determine whether it may enter *any* judgment in this case consistent with the First Amendment.

### A. General Principles

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. Despite this absolutist language, it is clear that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981); *see also Cox v. State of Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965); *Konigsberg v. State Bar of California,* 366 U.S. 36, 49, 81 S.Ct. 997, 1006, 6 L.Ed.2d 105 (1961). Even protected expression may be subject to appropriate regulation in the interest of advancing other important rights. *Kovacs v. Cooper,* 336 U.S. 77, 88, 69 S.Ct. 448, 454, 93 L.Ed. 513 (1949); *Carpenters and Joiners Union of America, Local No. 213 v. Ritter's Cafe,* 315 U.S. 722, 725–26, 62 S.Ct. 807, 809, 86 L.Ed. 1143 (1942).

The Supreme Court has long struggled to accommodate competing constitutional rights in the context of peaceful protests. It is well settled that peaceful picketing on an issue of public concern in a public forum is constitutionally protected. *Frisby v. Schultz,* 487 U.S. 474, 479–81, 108 S.Ct. 2495, 2499–2500, 101 L.Ed.2d 420 (1988). However, it need not be tolerated in all places and under all circumstances. *Bakery and Pastry Drivers and Helpers Local 802 of International Brotherhood of Teamsters v. Wohl,* 315 U.S. 769, 775, 62 S.Ct. 816, 819, 86 L.Ed. 1178 (1942). This is because picketing is not purely speech. *Id.* 62 S.Ct. at 819–20. It also is inherently a form of conduct that may create substantial disorder or invade the rights of others in certain circumstances. *See Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969). Such "symbolic expression" or "expressive conduct" may be

---

5. The jury found in favor of Ellen Pavlich on the claims for intentional infliction of emotional distress and invasion of privacy. They also returned a verdict in favor of Laura Tellier on the claims for intentional infliction of emotional distress and civil conspiracy. Richard Blinn was found not liable under any theory of recovery.

validly regulated if the conduct itself may be regulated. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 294, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *United States v. O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968); *see also Gregory v. City of Chicago,* 394 U.S. 111, 125, 89 S.Ct. 946, 954, 22 L.Ed.2d 134 (1969) (Black, J., concurring).

■ The conduct element of picketing therefore is subject to appropriate regulation of its time, place, and manner. *Carey v. Brown,* 447 U.S. 455, 470, 100 S.Ct. 2286, 2295, 65 L.Ed.2d 263 (1980); *Police Dep't of the City of Chicago v. Mosley,* 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972). A constitutionally permissible time, place, and manner regulation must: (1) be content-neutral; (2) be narrowly tailored to serve an important or substantial government interest; and (3) preserve ample alternative channels of communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *O'Brien,* 88 S.Ct. at 1679. A regulation that satisfies these standards is permissible even though it has the incidental effect of limiting free speech.[6] *Clark,* 104 S.Ct. at 3069; *O'Brien,* 88 S.Ct. at 1678–79. The Court must analyze the First Amendment issues presented in this case with these principles in mind.

■ It should be emphasized that the following analysis applies only to peaceful picketing and other forms of protected expression. There was overwhelming evidence in this case that some of the defendants engaged in behavior that has absolutely no First Amendment implications. Several defendants staked out plaintiffs' home and followed them around town. Others trespassed on private property. There also was evidence of unprovoked and threatening physi-

cal confrontations with plaintiffs. Such harassing, intrusive, and intimidating tactics are not protected by the First Amendment at all. *See National Organization for Women v. Operation Rescue,* 37 F.3d 646, 655 (D.C.Cir.1994) ("[U]nlawful conduct ... does not seriously implicate First Amendment concerns."). To the extent the evidence shows that any defendant engaged in such behavior, the First Amendment presents no bar to the jury's verdict.

■ Whether any defendant's participation in the mass mailing and telephone campaign against plaintiffs may serve as a basis for liability is a closer question. It is clear that a resident has an unequivocal right to demand that offensive mail not be sent to his home. *Rowan v. United States Post Office Dep't,* 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970). However, the sender's duty to refrain from further communication is not triggered until the recipient affirmatively requests that further mailings cease. *Id.* Absent such a request, it is the recipient's burden to throw offensive mail away. *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 72, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469 (1983). There is no evidence is this case that plaintiffs made an affirmative request that any defendant stop sending cards and letters.

■ On the other hand, threats are not protected by the First Amendment. *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969); *United States v. Howell,* 719 F.2d 1258, 1260–61 & n. 2 (5th Cir.1983), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). In order to escape constitutional scrutiny, the threat must be a "declaration of an intention or determination to inflict ... injury." *Howell,* 719 F.2d at 1260 n. 1 (citation omitted). A threat may be direct or it may be subtle. *See United States v. Gilbert,*

---

**6.** The "regulation" in this case is somewhat unique because it involves tortious conduct rather than the violation of a statute or injunction. In fact, the Court has found only one other case in which a common law tort was analyzed under the time, place, and manner doctrine. *See Valenzuela v. Aquino,* 800 S.W.2d 301 (Tex.App.— Corpus Christi 1990), *aff'd in part, rev'd in part,* 853 S.W.2d 512 (Tex.1993). Nevertheless, the imposition of tort liability is appropriately considered a "regulation" because it involves legal standards that govern or direct the conduct of a party. *See Hughes v. Superior Court of California In and For Contra Costa County,* 339 U.S. 460, 468, 70 S.Ct. 718, 723, 94 L.Ed. 985 (1950) ("Regulation may take the form of legislation ... *or be left to the ad hoc judicial process.*") (emphasis added).

884 F.2d 454, 457 (9th Cir.1989), *cert. denied,* 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990). To the extent any defendant communicated any such threat to plaintiffs by mail, such "expression" is not protected by the First Amendment. *United States v. Daly,* 756 F.2d 1076, 1082 (5th Cir.), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 558 (1985).

■ Threats communicated by telephone are similarly unprotected. In addition, Congress has provided criminal penalties against any person who "makes repeated telephone calls ... solely to harass any person at the called number." 47 U.S.C. § 223(a)(1)(D). The First Amendment does not immunize such activity. *See Gormley v. Director, Connecticut State Dep't of Probation,* 632 F.2d 938, 941 (2d Cir.), *cert. denied,* 449 U.S. 1023, 101 S.Ct. 591, 66 L.Ed.2d 485 (1980); *United States v. Lampley,* 573 F.2d 783, 787 (3d Cir.1978). Thus, any defendant who repeatedly called plaintiffs solely to harass them or communicated threats of physical injury over the telephone is not entitled to protection under the First Amendment.

## B. *Time, Place and Manner Regulations*

As stated above, otherwise peaceful picketing activity may be regulated as to time, place, and manner. A valid regulation must: (1) be content-neutral; (2) be narrowly tailored to serve a significant government interest; and (3) preserve ample alternative channels of communication. *Ward,* 109 S.Ct. at 2753; *Perry Education Ass'n,* 103 S.Ct. at 955. The Court will consider each of these requirements in turn.

### 1. *Content–Neutrality*

■ The first question is whether the imposition of tort liability against defendants is content-neutral. A regulation is content-neutral when it is justified without reference to the content of the regulated speech. *Clark,* 104 S.Ct. at 3069. A regulation that satisfies this standard will be upheld even though it may have incidental effects on some speakers or messages but not others. *Ward,* 109 S.Ct. at 2754; *see also Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986).

The torts of intentional infliction of emotional distress and invasion of privacy are undoubtedly facially content-neutral. They apply equally to any conduct that violates the standards they impose regardless of its First Amendment implications. There are no exemptions or exceptions that might indicate favoritism or hostility toward a particular viewpoint. *Cf. Mosley,* 92 S.Ct. at 2293–94 (ordinance banning all picketing near school facilities except labor picketing found content-based).

Of course, both intentional infliction of emotional distress and invasion of privacy require proof that defendants' behavior was outrageous or offensive. *See Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993) (intentional infliction of emotional distress); *Valenzuela v. Aquino,* 853 S.W.2d 512, 513 (Tex. 1993) (invasion of privacy). Defendants point out that speech may not be regulated merely because it is offensive, outrageous, or intended to coerce. *See Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971); *Hustler Magazine v. Falwell,* 485 U.S. 46, 55, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988). This is certainly true, but it misses the mark in this case.

Defendants fail to acknowledge that picketing involves both speech *and* conduct. *See NLRB v. Retail Store Employees Union, Local 1001,* 447 U.S. 607, 618–19, 100 S.Ct. 2372, 2379, 65 L.Ed.2d 377 (1980) (Stevens, J., concurring in part); *Wohl,* 62 S.Ct. at 819. Courts have recognized that:

> [a] communication may be offensive in two different ways. Independently of the message the speaker intends to convey, the form of his communication may be offensive—perhaps because it is too loud or too ugly in a particular setting. Other speeches, even though elegantly phrased in dulcet tones, are offensive simply because the listener disagrees with the speaker's message.

*Consolidated Edison Co. of New York, Inc. v. Public Service Commission of New York,* 447 U.S. 530, 546–47, 100 S.Ct. 2326, 2338, 65 L.Ed.2d 319 (1980) (Stevens, J., concurring in the judgment) (footnotes omitted). A regulation aimed at the offensiveness of the *form* of the communication, rather than the *content* of the message, is content-neutral. *See*

*Gregory,* 89 S.Ct. at 953–54 (Black, J., concurring). The jury was specifically instructed that it could base liability only on defendants' conduct, not the content of their anti-abortion message. *See* COURT'S CHARGE TO THE JURY at 7–8. The Court must presume that the jurors followed this instruction. *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); *Stine v. Marathon Oil Co.,* 976 F.2d 254, 267 (5th Cir.1992).

The Court concludes that the jury imposed liability based on the form of defendants' communication, not because they disagreed with their message. *See Clark,* 104 S.Ct. at 3070. The verdict therefore was content-neutral.

### 2. *Narrow Tailoring*

The imposition of tort liability must be narrowly tailored to serve an important government interest. It is clear that the torts of intentional infliction of emotional distress and invasion of privacy serve important state interests. The Court further finds that, properly limited to specific forms of proscribed conduct, these torts can be narrowly tailored to further those interests.

#### a.

The first issue is whether these common law torts further significant government interests. Clearly they do. States have both "the power and duty ... to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of [their] residents." *Carlson v. California,* 310 U.S. 106, 113, 60 S.Ct. 746, 749, 84 L.Ed. 1104 (1940). The Supreme Court has consistently recognized a substantial government interest in protecting individual privacy. *See Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975) (describing privacy as an interest "plainly rooted in the traditions and significant concerns of our society"); *Rowan,* 90 S.Ct. at 1490 (recognizing the right of every person "to be let alone"). Similarly, citizens have a right to be protected from the kind of "abuse" that the tort of intentional infliction of emotional distress proscribes. *See Farmer v. United Brotherhood of Carpenters and Joiners of America, Local 25,* 430 U.S. 290, 302–03, 97 S.Ct. 1056, 1064–65, 51 L.Ed.2d 338 (1977); *St. Elizabeth Hospital v. Gar-rard,* 730 S.W.2d 649, 652 (Tex.1987) ("[F]reedom from severe emotional distress is an interest which the law should serve to protect.").

Finally, plaintiffs claim that defendants conspired to intentionally inflict emotional distress and invade their privacy. The tort of civil conspiracy prohibits two or more people from acting in concert to violate the protected rights of others. *See Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex.1995). It follows that the tort of civil conspiracy furthers the same significant interests as the substantive rights it protects. *See United States v. Lee,* 935 F.2d 952, 955 (8th Cir.1991), *rev'd on other grounds,* 6 F.3d 1297 (8th Cir.1993), *cert. denied,* 511 U.S. 1035, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994) (finding a substantial government interest in protection from conspiracies to violate federally guaranteed rights).

#### b.

The next issue is whether the torts of intentional infliction of emotional distress and invasion of privacy can be narrowly tailored to further these important interests without unduly burdening free speech. Before addressing that issue, the Court must determine the appropriate legal standard governing its analysis.

##### (i)

Under the traditional formulation of the time, place, and manner doctrine, a regulation is narrowly tailored when it "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby,* 108 S.Ct. at 2503. Such a regulation need not be the least restrictive or intrusive imaginable alternative. *Ward,* 109 S.Ct. at 2757–58. Rather, the regulation is permissible if it is not substantially broader than necessary to achieve the government's interest. *Id.* at 2758; *see also United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985) (narrow-tailoring requirement is satisfied if the government's interest "would be achieved less effectively absent the regulation").

However, the Supreme Court recently fashioned a more rigorous narrow-tailoring

standard when the regulation under review is an injunction. *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). The Court held that an injunction must "burden no more speech than is necessary to serve a significant government interest." *Id.* at 2525. Consequently, an injunction must employ the least restrictive means to accomplish its legitimate purpose. *See id.* at 2530 (striking down portion of injunction creating a 300–foot buffer zone around the residences of abortion clinic personnel because a less restrictive regulation could have accomplished the desired result). The Court emphasized, however, that this rigorous standard applies only to injunctions. Ordinances and statutes of general application are still governed by the more lenient formulation of the narrow-tailoring requirement. *See id.* at 2524–25.

The Court therefore must determine which of these standards to apply when the regulation under consideration is the imposition of tort liability. This appears to be an issue of first impression. Based on the rationale of the *Madsen* decision, the Court concludes that common law torts are more analogous to statutes of general application and should be governed by the traditional standard of review.

Two principal concerns motivated the adoption of a more rigorous standard in *Madsen*. First, the Court observed that injunctions carry a significant risk of censorship. *Id.* at 2525. Injunctions present such risks because they prohibit conduct that has not yet occurred. "It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246–47, 43 L.Ed.2d 448 (1975). As a result, injunctions must be precisely drawn to avoid inordinately chilling potentially protected speech.

Common law torts do not implicate such risks. Rather, they merely provide an aggrieved plaintiff with a remedy for harms that have already occurred. This is entirely consistent with the First Amendment. *Id.* at 1246; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 385, 94 S.Ct. 2997, 3029, 41 L.Ed.2d 789 (1974). The Supreme Court has long recognized the important distinction between subsequent punishment schemes and so-called prior restraints. *See, e.g., Alexander v. United States*, 509 U.S. 544, 548, 113 S.Ct. 2766, 2770, 125 L.Ed.2d 441 (1993); *Southeastern Promotions, Ltd.*, 95 S.Ct. at 1246; *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952); *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 714, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931); *Patterson v. People of State of Colorado ex rel. Attorney General of State of Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). Tort liability falls squarely within the sphere of legitimate subsequent punishments.

The second concern expressed in *Madsen* was that injunctions are more likely to be applied in a discriminatory fashion. *Madsen*, 114 S.Ct. at 2524. The Court did not explain why it believed injunctions carry such risks, although this concern likely was related to the larger censorship issues. However, the Court noted that " 'there is no more effective practical guaranty [sic] against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.' " *Id, citing Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 112–113, 69 S.Ct. 463, 466–67, 93 L.Ed. 533 (1949). This is precisely how content-neutral tort law operates. The torts of intentional infliction of emotional distress and invasion of privacy apply equally to any defendant and any type of conduct, regardless of their First Amendment implications. This obviates the concerns expressed in *Madsen*.

The Court therefore finds that the more lenient standard of review applies to the regulation in this case. The jury's verdict may be upheld if it is not substantially broader than necessary to accomplish the legitimate objectives of protecting plaintiffs' privacy rights and emotional welfare.

(ii)

 Plaintiffs presented evidence that defendants picketed at their home, work, and church. However, each forum implicates different First Amendment concerns. The Supreme Court has noted that: .

[t]he nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." ... The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (citation omitted); *see also FCC v. Pacifica Foundation*, 438 U.S. 726, 747, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073 (1978); *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 248, 63 L.Ed. 470 (1919). In this case, the legitimate interest in protecting plaintiffs' privacy rights and emotional welfare is more directly and significantly implicated where picketing is directed at their home. *Carey*, 100 S.Ct. at 2296 (state's interest in protecting the well-being, tranquility, and privacy of the home is "of the highest order in a free and civilized society"); *Pacifica Foundation*, 98 S.Ct. at 3040 (individual's right to be left alone in the privacy of his own home "plainly outweighs the First Amendment rights of an intruder").

The reason for this heightened concern is two-fold. First, picketing is particularly inimical to the unique nature of the home. The Supreme Court has described the home as "the last citadel of the tired, the weary, and the sick ... the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits." *Frisby*, 108 S.Ct. at 2502 (citations omitted). It has rejected the notion that "homes, the sacred retreat to which families repair for their privacy and their daily way of living, [should] have to have their doors thrown open to all who desire[ ] to convert the occupants to new views, new morals, and a new way of life." *Gregory*, 89 S.Ct. at 954 (Black, J., concurring). Thus, government has a particularly acute interest in protecting the tranquility and privacy of citizens in their homes "wherein they can escape the hurly-burly of the outside business and political world." *Id.* at 950.

Moreover, the right of residential privacy necessarily includes the right to avoid unwanted communications. *Frisby*, 108 S.Ct. at 2502. The Constitution may guarantee the right of free speech, but it does not compel anyone to listen. *Rowan*, 90 S.Ct. at

1490. In the public arena, we must simply turn away or avert our eyes to avoid unwanted communication. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211–12, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975); *Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971). Residents, however, are a captive audience with little or no ability to avoid unwanted speech directed toward them. *Frisby*, 108 S.Ct. at 2504; *see also Kovacs*, 69 S.Ct. at 453. The government therefore may regulate unwelcome speech to protect residents in their own homes. *Frisby*, 108 S.Ct. at 2502; *see also Pacifica Foundation*, 98 S.Ct. at 3039–40; *Rowan*, 90 S.Ct. at 1491; *Kovacs*, 69 S.Ct. at 453–53. Speakers who direct their messages towards the home have no right to "insert a foot in the door and insist on a hearing." *Kovacs*, 69 S.Ct. at 453.

These principles inform the Court's resolution of the narrow-tailoring issue. The Supreme Court has determined that an ordinance prohibiting "focused picketing" is appropriately narrowly tailored to serve the government's interest in safeguarding residential privacy. *Frisby*, 108 S.Ct. at 2504. Focused picketing is picketing "directed at a particular residence." *Id.* at 2502. The Court recognized that such picketing generally is not pursued for its efficacy in communicating a message to the general public, but rather principally "to intrude upon the targeted resident, and to do so in an especially offensive way." *Id.* at 2503. Because the medium of expression itself creates the "evil" that may be regulated, a complete ban of focused picketing is narrowly tailored. *Id.* at 2504. Other courts have applied *Frisby* when fashioning injunctive relief. *See, e.g., Ramsey v. Edgepark, Inc.*, 66 Ohio App.3d 99, 583 N.E.2d 443, 450 (1990), *cause dismissed*, 53 Ohio St.3d 712, 560 N.E.2d 780 (1990). Extending this logic, the Court concludes that the tort of invasion of privacy may be narrowly tailored where it is limited to harms caused by focused picketing.

No similar precedent exists to guide the Court's resolution of the narrow-tailoring issue with respect to the tort of intentional infliction of emotional distress. However, an intermediate state appellate court has held

that allowing recovery for *negligent* infliction of emotional distress was inconsistent with the First Amendment. *Valenzuela v. Aquino*, 800 S.W.2d 301, 308 (Tex.App.—Corpus Christi 1990). The Texas Supreme Court upheld this portion of the decision without discussion. *Valenzuela*, 853 S.W.2d at 514.

The holding in *Valenzuela* appears to have been based on two factors. First, the appellate court noted that speech cannot be regulated merely because it is "outrageous." *Valenzuela*, 800 S.W.2d at 308–09. Indeed, the Supreme Court has held:

> An "outrageousness" standard . . . runs afoul of our longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience. "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection."

*Falwell*, 108 S.Ct. at 882, *quoting Pacifica Foundation*, 98 S.Ct. at 3038. The *Valenzuela* court found this reasoning "controlling" of its decision to overturn the damages award. *Valenzuela*, 800 S.W.2d at 309.

However, the *Valenzuela* decision fails to recognize the critical distinction between pure speech and expressive conduct.[7] *Falwell* involved the publication of a magazine article. The government does not have a sufficient interest in restricting the publication of such material unless it is obscene, defamatory, or likely to incite violence. *See Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). Picketing, by contrast, is "inseparably something more and different" than publishing a magazine article. *Hughes*, 70 S.Ct. at 721. The Supreme Court has "emphatically" rejected the idea that the First Amendment "afford[s] the same kind of freedom to those who would communicate ideas by conduct such as . . . picketing . . . as

[it does] to those who communicate ideas by pure speech." *Cox*, 85 S.Ct. at 464–65. As previously noted, *conduct* may be regulated if it offends the significant, protected rights of others. This is precisely the holding in *Frisby*. *Frisby*, 108 S.Ct. at 2053 (upholding ban on focused picketing because it "inherently and offensively intrudes on residential privacy").

The *Valenzuela* court also expressed concern that "[t]he specter of protestors being subject to unlimited liability for claims of *negligent* infliction of emotional distress from a contingent of unknown plaintiffs would doubtless have a stifling effect on expressive speech." *Valenzuela*, 800 S.W.2d at 309 (emphasis added). Of course, plaintiffs in this case sued for *intentional* infliction of emotional distress.[8] The element of intent alone, however, is not sufficient to eliminate the specter of liability from a contingent of unknown plaintiffs. There is no requirement under Texas law that a defendant's outrageous conduct be consciously directed at a particular individual. *Johnson v. Standard Fruit and Vegetable Co.*, — S.W.2d —, —, 1997 WL 542322 at *8 (Tex.App.—Houston [1st Dist] Aug.29, 1997).

Nevertheless, the Court concludes that the tort of intentional infliction of emotional distress can be narrowly tailored if liability is limited to harms caused by focused picketing. This is because focused picketing itself contains an inherent element of intent to harm a particular individual:

> The type of focused picketing prohibited by the [regulation] is fundamentally different from more generally directed means of communication that may not be completely banned in residential areas. In such cases, "the flow of information [is not] into . . . household[s], but to the public." Here, in contrast, the picketing is narrowly directed at the household, not the public. The type of picketers banned by the [regulation] generally do not seek to disseminate a

---

7. The court did note one commentator's suggestion that "tort liability for communicative conduct be limited to the extent that liability would apply to the conduct absent the communication." *Valenzuela*, 800 S.W.2d at 309 n. 1. This appears to be a sensible application of the narrow-tailoring requirement. However, it was rejected by the court without explanation.

8. The Texas Supreme Court has since abolished the tort of negligent infliction of emotional distress. *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993).

message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. *Frisby*, 108 S.Ct. at 2503 (citations omitted). By definition, focused picketing assumes that protestors intend to harm a particular, targeted individual. It is this element of intent that allows liability to be narrowly tailored to protect the emotional welfare of those individuals who were targeted by the demonstrations.

Finally, the tort of civil conspiracy protects the same interests as the underlying substantive torts. Liability for civil conspiracy must be similarly limited to harms caused by the focused picketing of plaintiffs' home.[9]

### 3. Alternative Channels of Communication

■ The final element of the time, place, and manner test is whether the regulation leaves open ample alternative channels of communication. This requirement ensures that the regulation does not "ha[ve] the effect of entirely preventing a 'speaker' from reaching a significant audience with whom he could not otherwise lawfully communicate." *O'Brien*, 88 S.Ct. at 1685 (Harlan, J., concurring).

Defendants clearly have ample alternative channels of communication. The only type of expressive activity which subjects defendants to tort liability is focused picketing. As the evidence shows, defendants used a variety of other forms of communication to put forth their anti-abortion message. No liability may be imposed for picketing at plaintiffs'

work, church, or general neighborhood marches.[10] Defendants cannot be held liable for distributing leaflets or hanging posters. These alternative channels of communication are more than adequate to satisfy this part of the time, place, and manner test.

### III.

### POST–VERDICT MOTIONS

Defendants contend that they are entitled to judgment as a matter of law because: (1) their conduct is protected by the First Amendment; and (2) the evidence is insufficient to support the jury's findings of intentional infliction of emotional distress, invasion of privacy, and civil conspiracy. Plaintiffs move for judgment on the verdict. The First Amendment issues have already been addressed. The Court now considers the sufficiency of the evidence.

### A. Standard of Review

■ A party is entitled to judgment as a matter of law if "there is no legally sufficient evidentiary basis" to submit an issue to the jury. FED.R.CIV.P. 50(a)(1); *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir.1994). A mere "scintilla" of evidence is insufficient. There must be a conflict in substantial evidence to create an issue of material fact. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969). The motion should be granted only "if the facts and inferences point so strongly and overwhelmingly in favor of the moving party ... that reasonable jurors could not have arrived at a contrary verdict." *Crist v. Dickson Welding*,

9. The jury was instructed that "[t]here is no right to force speech into the house of an unwilling listener" and "the first amendment does not protect focused picketing and related activities taking place solely in front of a particular residence." COURT'S CHARGE TO THE JURY at 8. Although the jury was not specifically told that tort liability must be based on focused picketing, neither side requested such an instruction. Moreover, there was ample evidence that plaintiffs were the targets of focused demonstrations. Plaintiffs introduced a videotape showing a cluster of protestors standing in their driveway. (Pl. Exh. 721). The demonstrators are not walking up and down the street. They are not marching through the neighborhood. Rather, they are standing together in a stationary group in front of plaintiffs' home holding picket signs and chanting. This is clearly focused picketing. *See Frisby*, 108 S.Ct. at 2501 (defining focused pick-

eting as "picketing focused on, and taking place in front of, a particular residence"). On the other hand, some of the demonstrations consisted of more general marches or parades through plaintiffs' neighborhood. This type of publicly directed picketing may not be regulated. *Id.* at 2502. The jury was entitled to impose liability and award damages to the extent that any defendant engaged in focused picketing.

10. The Court is troubled by the notion that a person may be subjected to focused picketing at their place of worship. Indeed, the right to engage in quiet and reflective prayer without being subjected to unwarranted intrusion is an essential component of freedom of religion. The government certainly has a significant interest in protecting this important First Amendment right. However, neither party has briefed or argued this constitutional issue.

*Inc.,* 957 F.2d 1281, 1285 (5th Cir.), *cert. denied,* 506 U.S. 864, 113 S.Ct. at 187, 121 L.Ed.2d 132 (1992); *Shipman,* 411 F.2d at 374. The entire record must be viewed in the light most favorable to the party opposing the motion. *Resolution Trust Corp. v. Cramer,* 6 F.3d 1102, 1109 (5th Cir.1993); *Barnett v. IRS,* 988 F.2d 1449, 1453 (5th Cir.), *cert. denied,* 510 U.S. 990, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993).

▉ Where several defendants are held jointly and severally liable, the evidence supporting the verdict must be sufficient as to each defendant. "[T]he liability of members of a group should be analyzed in terms of the specific actions undertaken, authorized, or ratified by those members." *Juhl v. Airington,* 936 S.W.2d 640, 641 (Tex.1996). Defendants who engaged in focused picketing and other forms of conduct not protected by the First Amendment may be held liable for the foreseeable consequences of their actions. However, those defendants who engaged only in constitutionally protected activities may not be held liable merely because they associated with the other defendants. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 919, 102 S.Ct. 3409, 3429, 73 L.Ed.2d 1215 (1982). The Court must evaluate the conduct of each defendant with these principles in mind.

### B. *Intentional Infliction of Emotional Distress*

▉ Texas law recognizes a cause of action for intentional infliction of emotional distress. In order to prove a claim, plaintiffs must show that: (1) defendants acted intentionally or recklessly; (2) their conduct was extreme and outrageous; and (3) plaintiffs suffered severe emotional distress as a result of that behavior. *Twyman,* 855 S.W.2d at 621; *see also* RESTATEMENT (SECOND) OF TORTS § 46. The jury found Dallas PLAN, Operation Rescue, Missionaries to the Pre–Born, Thomas Cyr, Phillip Benham, Oldrich Tomanek, Louis Farinholt, Ann Hollacher, and J.R. Dannemiller liable under this theory of recovery.[11]

▉ Defendants attack the jury's finding that their conduct was "extreme and outra-

geous" on two grounds. First, they contend that the "outrageousness" standard violates the First Amendment. This argument has already been rejected by the Court. As previously noted, defendants ignore the crucial distinction between *speech* and *conduct.* Although outrageous speech is protected by the Constitution, outrageous conduct is not. Defendants completely ignore the fact that focused residential picketing is so inimical to the home environment that it may be banned *entirely. See Frisby,* 108 S.Ct. at 2504. This type of *conduct* need not be tolerated in a civilized society. *See Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994). In other words, it is outrageous *per se.*

▉ Defendants further contend that their conduct was not extreme or outrageous as a matter of law. Conduct is "extreme" and "outrageous" when it goes beyond all possible bounds of decency and may be regarded as atrocious and utterly intolerable. *Id.*

▉ The Court finds that the evidence was more than sufficient to show that Cyr, Benham, Tomanek, and Farinholt engaged in extreme and outrageous conduct even without considering any potentially protected expressive activity. All four of these defendants admitted to following plaintiffs' cars on numerous occasions. Cyr and Tomanek even engaged plaintiffs in a high-speed chase through the streets of Dallas. Cyr, Tomanek, and Farinholt all spied on plaintiffs' home from a car parked behind the house for extended periods of time. They also followed Dr. Tompkins to a restaurant where they physically confronted him and forced him to leave. Tomanek twice confronted Mrs. Tompkins in an aggressive and threatening manner outside her home. Benham and Tomanek both trespassed on plaintiffs' property. Cyr and Tomanek made repeated phone calls to plaintiffs which were made with no other purpose but to harass them. In addition, Tomanek left a message for Dr. Tompkins at his office saying he was "going to get" him. A reasonable jury could easily conclude that these defendants engaged in extreme and outrageous conduct.

---

11. Dannemiller was found liable for intentional infliction of emotional distress as to Dr. Tomp-

kins but not Mrs. Tompkins. All other defendants were found liable to both plaintiffs.

■ The evidence compels a different conclusion with respect to J.R. Dannemiller and Ann Hollacher. Their conduct was limited to non-focused residential picketing.[12] The only evidence with respect to Dannemiller showed that he picketed at the corner of plaintiffs' neighborhood. This is not focused picketing and the verdict against him cannot stand.

Several witnesses testified that Hollacher was a frequent participant in the protests at plaintiffs' home. However, nothing in the record supports the conclusion that Hollacher engaged in *focused* picketing. No one identified her as a member of the group standing in plaintiffs' driveway as depicted in the videotape.[13] There is simply no basis for the Court to conclude that Hollacher *directed* her picketing at plaintiffs' residence as opposed to marching through the neighborhood. The latter activity is clearly protected by the First Amendment. *See Frisby*, 108 S.Ct. at 2502. Consequently, the verdict against Hollacher must be set aside.

■ The jury also found Dallas PLAN, ·Operation Rescue, and Missionaries to the Pre–Born liable for intentional infliction of emotional distress. A corporation can act only through its agents. *Agri Export Cooperative v. Universal Savings Ass'n*, 767 F.Supp. 824, 829, *as amended*, 780 F.Supp. 1466 (S.D.Tex.1991); *Upper Valley Aviation, Inc. v. Mercantile National Bank*, 656 S.W.2d 952, 957 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). Under familiar principles of agency law, a corporation is liable for the intentional torts of its officers committed within the course and scope of their employment. *Wal–Mart Stores, Inc. v. Odem*, 929 S.W.2d 513, 530 (Tex.App.—San Antonio 1996, writ denied).

■ Cyr was the president and founder of Dallas PLAN, an organization devoted to the elimination of abortion. Dallas PLAN was primarily responsible for the coordinated campaign of harassment and intimidation directed against the Tompkins family. Supporters were encouraged to participate in demonstrations at plaintiffs' home. Its newsletter published plaintiffs' address and telephone number and encouraged readers to call or write at least twice a week. Dallas PLAN kept a file on plaintiffs so they could be followed and "exposed" everywhere they went. Cyr acted in conformity with the stated goals of Dallas PLAN. Clearly, these acts were within the course and scope of his role as an officer of the organization. Dallas PLAN therefore is liable for intentional infliction of emotional distress.

■ The same analysis applies to Operation Rescue. The stated goal of this national organization is to stop abortion. Benham was the director of the Dallas/Fort Worth Branch of Operation Rescue at all times relevant to this suit.[14] Locally, Operation Rescue shared office space, equipment, personnel, and records with Dallas PLAN. It helped coordinate Operation John the Baptist. The evidence showed that Operation Rescue sponsored regional and national events where participants were schooled in the same techniques and tactics used against plaintiffs in this case. Benham's actions were within the scope of his duties as a corporate officer. Those actions were extreme and outrageous. The verdict against Operation Rescue is supported by the evidence.

■ The Court reaches a different conclusion with respect to the verdict against Missionaries to the Pre–Born. The evidence showed only that Farinholt "headed" that organization and was designated as its corporate representative at a deposition. These facts do not establish that Farinholt was an officer, agent, or otherwise had any authority to bind Missionaries to the Pre–Born by his actions.[15]

---

12. Hollacher testified that she placed two telephone calls to plaintiffs' residence. However, this evidence is insufficient to show that she made "repeated" calls with a specific intent to "harass" plaintiffs. *See* 47 U.S.C. § 223(1)(D).

13. The only defendant positively identified as being present at that particular demonstration was Tomanek.

14. Benham had become director of the national organization at the time of trial.

15. The evidence suggests that the terms "missionary" and "missionary to the pre-born" are used somewhat generically in the pro-life community. Cyr's regular column in the Dallas PLAN newsletter was entitled "Message from a Missionary." (*See* Pl.Exhs. 558, 729). The newsletter also noted, in regard to its annual

Of course, a corporation may ratify the actions of a person who acts without authority on its behalf. *See King v. McGuff,* 149 Tex. 432, 234 S.W.2d 403, 405 (1950); *Odem,* 929 S.W.2d at 530. However, a principal cannot ratify an act unless he has knowledge of it. *Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654 (5th Cir. 1994). There was no evidence that Missionaries to the Pre–Born, which apparently is based in Detroit, had any knowledge of Farinholt's actions at the time they occurred or subsequently ratified his conduct. Accordingly, the verdict against this defendant is set aside.

## C. *Invasion of Privacy*

A plaintiff may recover for invasion of privacy if: (1) the defendant intentionally intruded, physically or otherwise, upon his solitude, seclusion, private affairs or concerns; and (2) the intrusion would be highly offensive to a reasonable person. *Valenzuela,* 853 S.W.2d at 513; RESTATEMENT (SECOND) OF TORTS § 652B. The jury found Dallas PLAN, Operation Rescue, Missionaries to the Pre–Born, Thomas Cyr, Phillip Benham, Oldrich Tomanek, Louis Farinholt, Ann Hollacher, Laura Tellier, and J.R. Dannemiller liable for invasion of privacy.[16]

Defendants contest the sufficiency of the evidence as to both elements of this cause of action. First, they claim that there is no evidence of "intrusion" because they did not use intrusive means such as wiretaps. Defendants have provided absolutely no support for this suggested limitation on the right to privacy, and it is not the law. Privacy may be invaded by *any* intrusion, "physical or otherwise." *Valenzuela,* 853 S.W.2d at 513. Cyr, Farinholt, and Tomanek invaded plaintiffs' privacy by watching their house from a car parked on a side street and using binoculars and a camera. *See* PROSSER AND KEETON ON TORTS § 117 at 854–44 (5th ed. 1984). Benham used a bull-horn to preach during the demonstrations at plaintiffs' home, which invaded their privacy by creating excessive noise. *See Ward,* 109 S.Ct. at 2756; *Kovacs,* 69 S.Ct. at 454. Cyr and Tomanek made repeated and harassing phone calls to plaintiffs. This invaded their privacy as well. *Futerfas v. Park Towers,* 707 S.W.2d 149, 157 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *see also Donnel v. Lara,* 703 S.W.2d 257, 260 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.); PROSSER AND KEETON ON TORTS § 117 at 855. Tomanek invaded plaintiffs' privacy by rattling their gate while they were eating Thanksgiving dinner.

Defendants also reiterate their constitutional argument that damages may not be awarded for offensive speech. This argument is without merit for the reasons already discussed. The jury's verdict was based on offensive *conduct,* not speech. More specifically, focused residential picketing "inherently and offensively intrudes on residential privacy." *Frisby,* 108 S.Ct. at 2503. The evidence is more than sufficient to support the verdict against Cyr, Benham, Tomanek, and Farinholt.

However, there is no evidence that Hollacher, Tellier, or Dannemiller engaged in focused picketing or other intrusive conduct. Dannemiller only picketed at the corner of plaintiffs' street. Hollacher and Tellier were slightly more involved in the protests. But the record does not affirmatively show whether they *focused* their picketing at plaintiffs' residence or merely participated in general neighborhood marches. The latter activity is more akin to the "general dissemination of a message" that is protected by the First Amendment. *Id.* at 2502. Hollacher, Tellier, and Dannemiller therefore are entitled to judgment as a matter of law.

The evidence showed that Cyr and Benham conceived and organized the focused picketing campaign against plaintiffs. This course of conduct was consistent with their roles as officers of Dallas PLAN and Operation Rescue, respectively. It is not clear whether Cyr and Benham personally en-

budget, that "all full-time pro-lifers working as missionaries to the pre-born raise their own support." (Pl.Exh. 558). This further undermines the Court's confidence that Farinholt had any official association with the organization known as "Missionaries to the Pre–Born."

16. Tellier and Dannemiller were found liable under this theory of recovery as to Dr. Tompkins but not Mrs. Tompkins. All other defendants were found liable for invasion of privacy as to both plaintiffs.

gaged in any focused picketing. However, this is irrelevant. They orchestrated the focused demonstrations that intruded on the solitude and seclusion of plaintiffs' home. This is sufficient to support the verdict against Dallas Plan and Operation Rescue.

As before, there is no evidence that Missionaries to the Pre–Born is bound by Farinholt's actions. Nothing in the record demonstrates that Farinholt was an officer or agent of the organization. Nor is there any evidence that Missionaries to the Pre–Born ever ratified his conduct. The verdict against this defendant must be set aside.

### D. *Civil Conspiracy*

A civil conspiracy is "a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Triplex Communications, Inc.*, 900 S.W.2d at 719. An actionable conspiracy consists of: (1) two or more persons; (2) an objective to be accomplished; (3) a meeting of the minds on the objective; (4) one or more overt acts; and (5) damages as a proximate result of the conduct. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). The jury was instructed that "unlawful" in this case meant an invasion of privacy or intentional infliction of emotional distress. COURT'S CHARGE TO THE JURY at 17. Dallas PLAN, Operation Rescue, Missionaries to the Pre–Born, Thomas Cyr, Phillip Benham, Oldrich Tomanek, Louis Farinholt, Ellen Pavlich, J.R. Dannemiller, and Ann Hollacher were found liable for civil conspiracy.[17]

Each participant in a conspiracy must have the specific intent to injure the plaintiff. *See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856–57 (Tex.1968). A joint intent to engage in conduct that results in an injury is not sufficient to prove a conspiracy. *Juhl*, 936 S.W.2d at 644. Specific intent may be proved by circumstantial evidence. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979). Defendants challenge the sufficiency of the evidence with respect to this element of the conspiracy claim.

The Court initially observes that Pavlich was not found liable to plaintiffs for intentional infliction of emotional distress or invasion of privacy. In addition, the verdicts against Hollacher, Dannemiller, and Missionaries to the Pre–Born were set aside with respect to these claims. This does not necessarily preclude a conspiracy finding. A defendant is liable for conspiracy if he "participated" in an underlying tort for which the plaintiff seeks to hold at least one defendant liable. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996). "Participation" includes planning, assistance, or encouragement of another's unlawful acts. *Carroll*, 592 S.W.2d at 925–26.

Nevertheless, the Court finds that the verdict against Pavlich, Dannemiller, and Missionaries to the Pre–Born must be set aside. Neither Pavlich nor Dannemiller participated in any focused picketing of plaintiffs' residence. Nor was there evidence that these defendants assisted or encouraged others to violate plaintiffs' rights. Although Pavlich was once the treasurer for Dallas PLAN, she had relinquished that position and was no longer active in the organization well before the campaign against plaintiffs began. The evidence against Dannemiller was deficient for the same reasons. Dannemiller was the secretary of Dallas PLAN, participated in one or two mailings of its newsletter, and occasionally ran errands related to its general business. There was no evidence that any of these activities were related to the specific harms directed against plaintiffs.

Similarly, there is no evidence that Missionaries to the Pre–Born participated in a civil conspiracy. The evidence showed that Farinholt worked jointly with Dallas PLAN and Operation Rescue. The organizations shared office space, equipment, personnel, records, and phone lines. However, this does not support an inference that Farinholt had the authority to act on behalf of Missionaries to the Pre–Born. There was simply no evidence that Farinholt was a officer or agent of the organization or that Missionaries to the Pre–Born ever ratified his conduct.

---

**17.** The jury found that Dannemiller engaged in a civil conspiracy against Dr. Tompkins but not Mrs. Tompkins. All other defendants were found liable as to both plaintiffs.

In short, plaintiffs failed to prove that these defendants had the specific intent to injure them. Pavlich, Dannemiller, and Missionaries to the Pre–Born therefore are entitled to judgment as a matter of law as to the conspiracy claim.[18]

■ The Court reaches the same conclusion with respect to Hollacher but for different reasons. There was sufficient evidence that Hollacher participated in a conspiracy against plaintiffs with the specific intent to cause them injury. She accompanied Cyr to his initial meeting with Dr. Tompkins and was present when he threatened to make the doctor's practice "go away." Hollacher thus was aware of the wrongful intent of the ensuing campaign from its inception. She accompanied Cyr when he took the pictures of plaintiffs' license plates so they could be followed. Hollacher also agreed to "expose" plaintiffs wherever they went. Cyr testified that he often discussed tactical issues with her. Thus, there was adequate proof that Hollacher helped plan and encourage the campaign against plaintiffs and specifically intended to cause them harm. She is bound by the unlawful actions of the other co-conspirators. *Carroll*, 592 S.W.2d at 926.

■ However, the jury was never asked to assess damages resulting from this conspiracy. A finding of actual damages is necessary to support an award of exemplary damages. *Nabours v. Longview Savings & Loan Ass'n*, 700 S.W.2d 901, 903 (Tex.1985). Actual damages may not be presumed merely because the defendants engaged in a conspiracy. *See Hart v. Moore*, 952 S.W.2d 90, 98 (Tex.App.—Amarillo 1997). Since no actual damages were awarded against Hollacher, she is not liable for exemplary damages. This finding must be set aside.

■ The evidence was more than sufficient to support the inference that Dallas PLAN, Operation Rescue, Cyr, Benham, Tomanek, and Farinholt specifically intended to injure plaintiffs. The Court has previously detailed the extreme and outrageous conduct of these defendants. Some of the defendants testified that they only intended to confront plaintiffs with the immorality of abortion and convince Dr. Tompkins to relinquish that part of his medical practice. They claimed that they "loved" plaintiffs and were merely trying to set them on the right path. However, given the nature of the tactics employed to accomplish this goal, the jury certainly was entitled to discredit their protestations of good intent. The Court will enter a judgment against these defendants on the civil conspiracy claim.

## IV.

### *INJUNCTIVE RELIEF*

Plaintiffs also seek a permanent injunction against defendants. The state court issued a preliminary injunction in July 1993.[19] This order restricts protests on public property within 300 feet of plaintiffs' home. The defendants were permitted to hold one demonstration each day not to exceed twenty minutes in duration. Only two demonstrations were allowed each week between the hours of 9:00 a.m. and 6:00 p.m. No protests were to be held on Sundays. In addition, defendants were prohibited from: (1) parking or lurking within 1500 feet of plaintiffs' property between the hours of sunset and sunrise; (2) demonstrating at the Highland Park Methodist Church on Sundays between 8:00 a.m. and 1:00 p.m.; (3) obstructing entry to or exit from any portion of plaintiffs' residential property; and (4) intruding within the confines of plaintiffs' home by the use of voices, sound amplification equipment, musical instruments, or other noises. *See* TEMPORARY INJUNCTION ORDER, 7/14/93 at 2–3. Plaintiffs now want to make this injunction permanent in nature.

---

18. The award of exemplary damages against these defendants must also be set aside since actual damages were not properly assessed against them. *See Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 564 (5th Cir. 1997); *Federal Express v. Dutschmann*, 846 S.W.2d 282, 284 (Tex.1993).

19. The state court entered two separate injunctions in this case. The first injunction was entered on April 23, 1993, against the seven original defendants. Plaintiffs subsequently amended their pleadings to name 31 additional parties. A second injunction was entered on July 9, 1993, against all defendants. Both orders grant substantially the same relief.

## A. *Constitutional Arguments*

 Defendants oppose the proposed injunction on constitutional grounds. They first contend that the injunction is a prior restraint on speech. The Supreme Court has soundly rejected this argument:

Prior restraints do often take the form of injunctions. Not all injunctions which may incidentally affect expression, however, are "prior restraints" in the sense that term was used in *New York Times Co.[v. U.S.*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)] or *Vance[ v. Universal Amusement Co.*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980)].

*Madsen*, 114 S.Ct. at 2524 n. 2 (citations omitted). An injunction is not a *per se* prior restraint on speech. Moreover, the injunction in *Madsen* was upheld because it only curtailed speech in one limited locality and was not content-based. *Id.* Such is the case here.

 Defendants also claim that the injunction would violate their equal protection rights. However, they cite no authority and present no argument to support this assertion. Defendants may intend to argue that any injunction in this case would necessarily be content-based because it would apply only to people who share a particular viewpoint. The *Madsen* Court soundly rejected this proposition as well. *Id.* at 2524; *see also Ward*, 109 S.Ct. at 2754.

 Finally, defendants maintain that granting an injunction would usurp the role of the legislature to determine whether residential picketing should be proscribed. Once again, this argument is not supported by any case authority. In fact, the Court's equitable powers are designed to fill such gaps in the statutory law. *See McDonald v. Rodriguez*, 184 B.R. 514, 517 (S.D.Tex.1995); *Cutler v. 65 Security Plan*, 831 F.Supp. 1008, 1022 (E.D.N.Y.1993). Plaintiffs need not wait for the legislature to act in order to protect their interests.

## B. *Equitable Requirements*

 The Court now must consider whether plaintiffs are entitled to a permanent injunction. "[I]njunctions are an extraordinary remedy, to be granted only when a party is threatened with injury for which he cannot obtain a sufficient legal remedy." *DSC Communications Corp. v. Next Level Communications*, 107 F.3d 322, 328 (5th Cir. 1997). In order to obtain injunctive relief, a party must prove: (1) actual success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any corresponding harm to defendant; and (4) that the injunction will not disserve the public interest. *Sierra Club v. Glickman*, 974 F.Supp. 905, 943 (E.D.Tex.1997). Plaintiffs must satisfy their burden of proof as to each of these elements. *Plains Cotton Co-op. Ass'n of Lubbock, Texas v. Goodpasture Computer Serv., Inc.,* ·807 F.2d 1256, 1261 (5th Cir.), *cert. denied,* 484 U.S. 821, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir.1981). It is clear that plaintiffs have actually succeeded on the merits. The Court therefore need only address the last three elements of the test.

 The Court finds that there is a substantial threat of future harm if an injunction is not granted. Defendants' past actions indicate that they have little or no regard for plaintiffs' rights. Their campaign of focused picketing, stalking, harassment, and intimidation went totally unchecked until the state court issued a preliminary injunction. Although the jury compensated plaintiffs for the past effects of this unlawful conduct, their future rights cannot be protected absent injunctive relief. Moreover, there is evidence that plaintiffs would be subjected to increased risks if defendants were allowed to resume their activities. Dallas Blanchard, an expert in the anti-abortion movement, testified that peaceful demonstrations such as Operation John the Baptist often erupt in violence. He explained that these movements tend to attract outsiders who do not adhere to the non-violent philosophies espoused by the original leaders. The evidence in this case supports that conclusion. Plaintiffs received several threats from anonymous sources. Benham admitted that violence has occurred elsewhere despite his wishes. Plaintiffs have established a substantial threat of irreparable harm.

Plaintiffs also have shown that the threatened injury outweighs any harm to defendants and that the injunction will not disserve the public interest. The Tompkins clearly have a substantial and important interest in their privacy and emotional welfare. This is particularly true in the context of their home life. Under an appropriately tailored injunction, this interest would plainly outweigh any limitations on defendants' First Amendment rights. Defendants would still have ample opportunities for the general dissemination of their anti-abortion message. Moreover, the public interest is served by preserving the sanctity of the home as well as the vitality of free speech. *See, e.g., Northeast Women's Center, Inc. v. McMonagle,* 745 F.Supp. 1082, 1088, *as modified,* 749 F.Supp. 695 (E.D.Pa.1990), *aff'd,* 939 F.2d 57 (3d Cir.1991); *Kaplan v. Prolife Action League of Greensboro,* 111 N.C.App. 1, 431 S.E.2d 828, 839, *dismissed,* 335 N.C. 175, 436 S.E.2d 379 (1993), *cert. denied,* 512 U.S. 1253, 114 S.Ct. 2783, 129 L.Ed.2d 894 (1994). The Court finds that injunctive relief would advance both goals.

### C. *Scope of Injunction*

Finally, the Court must determine what kind of injunction to enter in this case. Any injunction that impinges on free speech must be narrowly tailored "to burden no more speech than is necessary to serve a significant government interest." *Madsen,* 114 S.Ct. at 2525. The government interest in this case is plaintiffs' right to privacy and emotional well-being.

The most troublesome aspect of the preliminary injunction is the "buffer zone" restrictions. The state court prohibited any protests on public property within 300 feet of plaintiffs' home. This is the same "buffer zone" held unconstitutional in *Madsen. Id.* at 2529–30. The Supreme Court indicated that a smaller zone would have been permissible. However, the Court is not inclined to create a "buffer zone" in this case. Plaintiffs moved from their house on Forest Lane in July 1993. They have proffered no evidence regarding the location or parameters of their current residence. In fact, it is unclear whether plaintiffs still live in Dallas. Therefore, the Court will make permanent only those aspects of the preliminary injunction that limit the number, duration, and time of day of the demonstrations. This includes the restriction against blocking ingress or egress to plaintiffs' home. The Court may modify this injunction if plaintiffs offer further evidence of the need for an appropriately limited "buffer zone."

The state court also enjoined defendants from parking within 1500 feet of plaintiffs' residence between the hours of sunset and sunrise. Restrictions on the surveillance of plaintiffs' home do not seriously implicate defendants' First Amendment rights. As noted above, however, plaintiffs no longer live in the house on Forest Lane. A 1500–foot restriction may have been warranted when defendants parked on the cul-de-sac behind the house in order to conduct their surveillance. However, these considerations are now moot. The Court has no information on which to fashion an appropriate parking restriction now that plaintiffs have moved. A 1500–foot "buffer zone" may well be overbroad if their new home is in the middle of a block or is not exposed from the back. Therefore, the Court will not make permanent this part of the preliminary injunction.

Defendants also were enjoined from "lurking about the premises between the hours of sunset and sunrise." This restriction seems applicable only to Tomanek. He was the only defendant who communicated actual threats of physical harm to plaintiffs. Tomanek also physically confronted Mrs. Tompkins in her driveway on two occasions and repeatedly trespassed on plaintiffs' property. The Court finds this conduct warrants a somewhat broader restriction on his access to their home. A 1500–foot restriction is appropriate under these circumstances. The Court further finds that the state court's definition of "lurking" is adequately detailed to withstand any vagueness objections and will adopt it as its own.[20]

---

20. The state court defined "lurking" as "prowling, lying hidden, keeping plaintiffs under surveillance, or remaining present but out of sight."

## V.

### ORDERS

Defendants' renewed motion for judgment as a matter of law and plaintiffs' motion for judgment on the verdict are granted in part and denied in part. Plaintiffs' motion for injunctive relief is granted, as modified. The Court will enter judgment as follows:

1. Plaintiffs shall recover actual damages in the amount of $2,248,000 for intentional infliction of emotional distress against Dallas PLAN, Operation Rescue, Thomas Cyr, Phillip Benham, Louis Farinholt, and Oldrich Tomanek, jointly and severally.

2. Plaintiffs shall recover actual damages in the amount of $2,800,000 for invasion of privacy against Dallas PLAN, Operation Rescue, Thomas Cyr, Phillip Benham, Louis Farinholt, and Oldrich Tomanek, jointly and severally.

3. Plaintiffs shall recover exemplary damages against the defendants as follows:

| | | |
|---|---|---|
| (a) | Dallas PLAN— | $1,104,050 |
| (b) | Operation Rescue— | $1,004,050 |
| (c) | Thomas Cyr— | $ 170,000 |
| (d) | Phillip Benham— | $ 170,000 |
| (e) | Oldrich Tomanek— | $ 80,000 |
| (f) | Louis Farinholt— | $ 81,250 |

4. The Court will enter a take-nothing judgment in favor of all defendants on the claims for tortious interference with a residential sales contract, tortious interference with existing and prospective patients, and civil RICO. These claims will be dismissed with prejudice. In addition, the Court will enter a take-nothing judgment in favor of Richard Blinn, Ellen Pavlich, Ann Hollacher, Laura Tellier, J.R. Dannemiller, and Missionaries to the Pre–Born on all claims and causes of action.

5. The Court will permanently enjoin Dallas PLAN, Operation Rescue, Thomas Cyr, Phillip Benham, Oldrich Tomanek, and Louis Farinholt from engaging in protest activities at plaintiffs' residence as follows:

(a) Demonstrations shall be limited to no more than two days in a calendar week. There shall be no more than one demonstration each day to be conducted between the hours of 9:00 a.m. and 6:00 p.m. No demonstrations shall be conducted on Sundays. Each demonstration is limited to twenty minutes in duration.

(b) Defendants shall not come upon, block, obstruct, or impede entry to or exit from any portion of plaintiffs' residential property.

(c) Oldrich Tomanek is prohibited from "lurking" within 1500 feet of plaintiffs' residential property between the hours of sunset and sunrise. As used in this order, "lurking" is defined as prowling, lying hidden, keeping plaintiffs under surveillance, or remaining present but out of sight.

(d) Defendants are enjoined from encouraging, soliciting, directing, abetting, or attempting to induce others to engage in conduct or activities contrary to the provisions of this order.

6. Plaintiffs are entitled to prejudgment interest at the prevailing legal rate on their actual damages.

7. All costs of court are taxed against Dallas PLAN, Operation Rescue, Thomas Cyr, Phillip Benham, Oldrich Tomanek, and Louis Farinholt, jointly and severally.

The parties are directed to confer on a form of proposed judgment. This includes the calculation of prejudgment interest. A proposed final judgment must be hand delivered to the chambers of the magistrate judge by *January 30, 1998.* The judgment must be approved as to form by all counsel of record.

SO ORDERED.